**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank J. VADINO, Elio Perez-Herrera, Ivan L. Stephans, Eduardo Comesana, Ralph Natale, Defendants-Appellants.**

No. 80–5716.

United States Court of Appeals,
Eleventh Circuit.

July 19, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 15, 1982.

Jeffrey M. Miller, Philadelphia, Pa., for Vadino and Natale.

Lin Brett-Major, Fort Lauderdale, Fla., for Comesana.

William R. Tunkey, Ronald A. Dion, Miami, Fla., for Perez-Herrera.

Max B. Kogen, Loren H. Cohen, Geoffrey C. Fleck, Miami, Fla., for Stephans.

Carmen C.. Nasuti, Philadelphia, Pa., for Natale.

William C. Bryson, Joel M. Gershowitz, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, RONEY and WOOD *, Circuit Judges.

GODBOLD, Chief Judge:

Appellants were convicted of narcotics offenses, all appellants of conspiracy to possess, 21 U.S.C. § 846, and some of possession with intent to distribute, 21 U.S.C. § 841(a)(1). Also, one appellant was convicted of using a telephone to facilitate a narcotics offense, 21 U.S.C. § 843, and another of carrying a firearm in commission of a felony, 18 U.S.C. § 924(c)(2).

Government informant Allen introduced Drug Enforcement Administration agents to appellants Vadino and Natale. Thereafter agents participated in a series of negotiations with Vadino, Natale, and appellant Stephans concerning purchase by the agents of 500,000 Quaaludes and 10 kilograms of cocaine. Appellant Comesana was present at one meeting aboard a boat. The negotiations culminated in a meeting for delivery, at a house on Jack Rabbit Lane, in Miami Lakes, Florida. Vadino, Stephans, and Comesana were present. At Stephans' direction Comesana left and returned with one kilo of cocaine, which Stephans weighed and tested. No more cocaine, and no Quaaludes, were brought to the delivery site before arrests were made.

After arrests were made at the house and while agents were still there, Agent Carew answered a telephone call from Stephans' wife. The agent told her that Stephans wanted her to "bring the stuff over." She replied that she could not because she had a runner there. Later that day agents went to the Stephans' home and entered it. The validity of this entry is questioned. A few minutes later a search warrant was issued, and pursuant to it the agents searched the house and found cocaine, Quaaludes, narcotics paraphernalia, and handwritten notes bearing the name of appellant Perez-Herrera.

While in the Stephans' house Agent Bumar answered a telephone call from Perez-Herrera, who identified himself as Stephans' "source of supply for drugs." That day and the next day Bumar conducted a series of calls to Perez-Herrera. Tapes of these conversations were played at trial. Several of Perez-Herrera's statements, the jury could have found, related to the deal with the government agents. In the first call Bumar told Perez-Herrera he was waiting for Stephans in order to complete a drug purchase. Perez-Herrera identified himself as Stephans' source of supply for drugs and asked Bumar to have Stephans

* Honorable Harlington Wood, Jr., Circuit Judge for the Seventh Circuit, sitting by designation.

return his call. In later calls Bumar asked if Perez-Herrera had promised Stephans ten kilos of cocaine, and Perez-Herrera answered in the affirmative. Bumar referred to Stephans "promising us 10 from you," and Perez-Herrera again answered affirmatively. Also Perez-Herrera told Bumar that Stephans had called him that day and asked for 500,000 Quaaludes that he did not have. He told Bumar that he was expecting a million and a half Quaaludes the next day. The jury could have found that the ten kilos of cocaine and the Quaaludes just referred to were the subject of the deal with agents.

A statement by Perez-Herrera offering to sell Bumar anything he wanted is not referable to the deal with the agents. In a call Perez-Herrera referred to holding 100,000 Quaaludes for Stephans; possibly the jury could not relate this to the deal made with the agents.

At trial Natale and Vadino asserted the defense of entrapment; in opening statements their respective counsel acknowledged that most of the prosecutor's opening statements describing the relevant events was correct.

## I. The superseding indictment; grand jury minutes

The original indictment, returned February 20, 1979, charged all appellants except Perez-Herrera with conspiracy to possess narcotics. Later, on April 4, Agent Bumar, who had talked by phone with Perez-Herrera, testified before the same grand jury concerning these conversations. The grand jury then returned a superseding indictment that was the same as the first indictment except that it added Perez-Herrera as a defendant to the conspiracy charge.

■ Natale, Vadino and Stephans contend that they could not validly be tried under the superseding indictment because it was supported by only evidence against Perez-Herrera and no evidence against them. In effect this argument is that, as a basis for the superseding indictment, the government was required to re-present to

the same grand jury the same evidence that the grand jury previously had heard, otherwise there was no evidence that these appellants were participating in the same conspiracy with Perez-Herrera. No authority is cited for this proposition, and we perceive no basis for holding that the grand jury must be told a second time what it already had been told.

■ In a variation of the same theme, these three appellants urge that they were prejudiced because adding Perez-Herrera as a defendant enabled the government to introduce at trial, over objections, Perez-Herrera's statements to Agent Bumar, which opened up a broader scope of activities in the penumbra of which they did not participate. But if the superseding indictment was valid—and we hold it was—to the extent Perez-Herrera's testimony was relevant to the conspiracy that it charged, the testimony was admissible. It was "prejudicial" in only the sense that it was probative of guilt.

Natale and Vadino argue that as a matter of law the evidence showed there were several conspiracies rather than a single conspiracy. This contention is frivolous. Alternatively they say that the jury could have found several conspiracies rather than one but was not instructed on this issue. Pretermitting whether such an instruction would have been appropriate, Natale and Vadino did not request it.

## II. Admissibility of co-conspirator's statements

### (A) Statements of Perez-Herrera

■ Natale, Vadino and Stephans contend that as to them Perez-Herrera's telephone statements to Bumar were inadmissible hearsay that do not qualify for the co-conspirator's exception of F.R.Ev. 801(d)(2)(E) because there was insufficient evidence to link Perez-Herrera to the conspiracy and also that when his statements were made the conspiracy had terminated by the arrest of all the conspirators known to the agents. The government concedes

that it did not meet the requirements of *U. S. v. James*, 590 F.2d 575 (5th Cir.), *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) with respect to these statements.

This point means little with respect to Natale and Vadino. Their assertion of the defense of entrapment constituted an admission that they committed acts constituting the offenses charged. *See U. S. v. Brooks*, 611 F.2d 614 (5th Cir. 1980); *U. S. v. Greenfield*, 554 F.2d 179 (5th Cir., 1977); *U. S. v. Morrow*, 537 F.2d 120, 138–39 (5th Cir. 1976).[1] The testimony of Perez-Herrera did not relate at all to the entrapment defense.

■ With respect to Stephans, admission of Perez-Herrera's statements was not reversible error. Stephans' participation in the conspiracy was established by overwhelming evidence independent of the Perez-Herrera statements. Stephens had been at one of the initial meetings aboard a yacht, where he delivered to agents samples of cocaine and Quaaludes. He described the Quaaludes as coming from Colombia and stated that they had an "excellent supply." At a later meeting on the boat Stephans quoted the price of cocaine and Quaaludes, stated the location for delivery, gave instructions for getting there, said that delivery would be in increments, and stressed the need for caution. When the group met at the Jack Rabbit Lane house for the delivery, Comesana left at Stephans' direction and returned later with a box containing a kilo of cocaine, which Stephans weighed and tested. Later that day Stephans' home was searched, and drugs and drug paraphernalia found there. Stephans offered no evidence in his defense. If admitting Perez-Herrera's telephone conversation was error, it was not reversible. Stephans was nailed without this evidence.

### (B) Statements by Natale, Vadino and Stephans

■ On *James* grounds Comesana questions the admission against him of out-of-court statements by Natale, Vadino and Stephans relating to his role in the activities. Pretermitting whether there was sufficient independent evidence to connect Comesana to the conspiracy when the testimony was admitted, there was adequate independent evidence before the end of the trial. When agents met on the boat for the first time with Vadino and Stephans, Comesana was also present. When an agent objected to Comesana's presence Vadino and Stephans explained that he was a karate expert and an expert marksman and was "Stephans' man" and was present for protection. These statements were in furtherance of the conspiracy—they were made to win acceptance by the agents of Comesana's presence and to explain his role in the conspiracy and his qualifications for it. There was other evidence that Comesana was present at the Jack Rabbit Lane house where the delivery was to take place. At Stephans' direction Comesana left the house and returned shortly thereafter with a kilo of cocaine, which Stephans weighed and tested.

Under *James* it is enough that proper foundation was laid by the end of the trial.

Admission of the statements of Natale, Vadino and Stephans did not violate the confrontation clause of the Constitution. The statements possessed "indicia of reliability"—they were spontaneous and supported by other evidence.

### III. Entry into and search of Stephans' home

■ When agents went to the Stephans' home, Mrs. Stephans answered their knock. The district court did not err in finding that she voluntarily consented to their entering.

---

1. One count on which Natale and Vadino were convicted charges conspiracy. Under some circumstances a defendant charged with conspiracy may plead entrapment and thereby admit overt acts but deny intent to engage in conspiracy. *U. S. v. Greenfield, supra.* This exception to the general rule has no application here where respective counsel for Natale and Vadino told the jury in opening statements that the prosecutor's description of the conspiracy was substantially correct.

■ At approximately the same time other agents were obtaining a search warrant for the Stephans' house. After it was issued agents who had been waiting at the house searched the house and seized narcotics and drug paraphenalia on the authority of the warrant. The affidavit supporting the search warrant sufficiently established probable cause.

### IV. Telephone calls to and from the two houses

■ Stephans contends that agents violated Title III of the Omnibus Crime and Safe Streets Act, 18 U.S.C. § 2510 et seq., and the Fourth Amendment, by receiving and making telephone calls on telephones at the Jack Rabbit Lane house and at his home on Milk Wagon Lane.

With respect to the Jack Rabbit Lane house, Stephans contends that items later seized at his home pursuant to the search warrant should have been suppressed because they were the fruits of Agent Carew's answering the phone at the Jack Rabbit Lane house and receiving the call from Stephans' wife. Assuming arguendo that this issue was properly raised [2] we perceive no privacy interest of Stephans that was violated under Fourth Amendment standards. Stephans was not a party to the conversation with Carew. When Carew answered the ringing phone the caller identified herself as Stephans' wife and freely talked to Carew. The record does not reveal that Stephans had such ownership or control of the Jack Rabbit Lane house as might arguably give him standing to object to Carew's answering the telephone.

■ Even if the Jack Rabbit Lane house was under Stephans' dominion and control—which was not satisfactorily established—Title III does not bar Bumar, an officer lawfully on the premises, from answering the ringing telephone. *U. S. v. Campagnuolo,* 592 F.2d 852 (5th Cir. 1979).

With respect to the Milk Wagon Lane house, Stephans conceded at trial that he did not question the validity of Agent Bumar's receiving the first incoming call from Perez-Herrera. Several calls were later made by Bumar to Perez-Herrera and were recorded. It appears that two of them originated from the Miami DEA office. The origin of the remaining four is not entirely clear, but assuming they originated at (and were recorded from) the Milk Wagon Lane house, we have already held in part II(A) that admission of Perez-Herrera's statements was not reversible error with respect to Stephans because his guilt was established by overwhelming independent evidence.

### V. Severance

■ Stephans, Comesana, and Perez-Herrera contend they were entitled to severance because the entrapment defense offered by Natale and Vadino was antagonistic and mutually exclusive to their defense. A co-defendant's reliance on entrapment does not of itself justify reversing a refusal to sever but rather the defenses must be antagonistic to the point of being mutually exclusive. *U. S. v. Salomon,* 609 F.2d 1172, 1173 (5th Cir. 1980).

■ The assertion by Natale and Vadino of their entrapment defense was not of itself mutually exclusive or irreconcilable with defenses by other defendants. The other defendants do not contend that Natale or Vadino offered evidence tending to incriminate them. Assertion of an entrapment defense may tend to bolster the credibility of prosecution witnesses, a point made by Perez-Herrera, but this is not enough to require severance, especially when the government's evidence is essentially uncontradicted. *See, e.g., U. S. v. Eastwood,* 489 F.2d 818, 821–22 (5th Cir. 1973); *U. S. v. Russo,* 455 F.2d 1225 (5th Cir.) *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972).

---

**2.** Stephans did not before or at trial move to suppress Carew's conversation with Mrs. Stephans, as required by F.R.Crim.P. 12(b)(3) & (f).

Nor were the other defendants entitled to severance because in opening statements counsel for Natale and Vadino admitted that most of the matters said by the prosecution in its opening statement were correct. Counsel for Natale and Vadino qualified their statements as being applicable to only their respective clients. The court instructed the jury that they should consider the case of each defendant separately.

■ The denial of severance did not violate the Sixth Amendment rights of other defendants under *Bruton v. U. S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *DeLuna v. U. S.*, 308 F.2d 140 (5th Cir. 1962). The concessions stated by counsel for Natale and Vadino were not the equivalent of co-defendants' statements subject to *Bruton,* and indeed, the court instructed that they were not evidence at all. *DeLuna* concerns severance where a defendant has a need to comment on the silence of a co-defendant, but the defenses of the two must be truly antagonistic rather than merely inconsistent.

Perez-Herrera was not, for reasons peculiar to him, misjoined under Criminal Rule 8(b) and 14, and the court did not err in denying him a severance. The evidence with respect to him, discussed below in Part VI, permitted the jury to infer that he was the supplier of the cocaine and the Quaaludes to be delivered to the agents in the sale and delivery in which the other conspirators were directly participating.

### VI. Sufficiency of the evidence

■ The court did not err in denying Perez-Herrera's motions for judgment of acquittal. The strong evidence against him was the taped conversations between him and Agent Bumar. We have described in the first part of this opinion the content of the calls and the parts that the jury could have found were the subject of the deal with the agents. This evidence was sufficient to submit the case to the jury. Moreover, the handwritten notes found in the trash compactor at the Stephans' home tied Perez-Herrera to Stephans. One said "Ellio (at home). Good news [with a line drawn through these two words]." Elio is Perez-Herrera's first name. The other said "Ellio in!! [underlined five times]." One note indicated that Perez-Herrera had called twice.

### VII. Evidence of extrinsic offenses by Perez-Herrera

■ Perez-Herrera objected to admission of the portions of his telephone conversations with Bumar relating to future drug transactions. This evidence was admissible under F.R.Evid. 404(b) and 403. Perez-Herrera's stated willingness to do business with Bumar in the future bolstered Perez-Herrera's statement that he was indeed a "source of supply," which he had identified himself as being.

■ Assuming that Perez-Herrera's objections were sufficient to reach the parts of the tapes that related to transactions, present and past and other than the deal with the agents, admitting these portions was not reversible error. Possibly the jury could not find that the reference to holding 100,000 Quaaludes for Stephans was related to Stephans' order for 500,000 Quaaludes, but in the context of the order for 500,000, and of Perez-Herrera's statement that he was expecting a million and a half Quaaludes the next day, the reference to a separate deal with Stephans for 100,000 Quaaludes is of minimal significance.

### VIII. Voir dire of jury

■ All appellants except Comesana urge as error the refusal of the court to permit questioning of prospective jurors concerning the weight to be given a law enforcement officer's testimony, merely because he is a law enforcement officer, as opposed to the testimony of an ordinary citizen. Such questioning would have been of little consequence except to Stephans. Natale and Vadino were asserting that they were entrapped by the non-officer informer Allen, who set them up with government

agents. The case against Perez-Herrera depended largely on the tapes of his telephone conversations with Bumar. In any event, we are bound by the rule of the former Fifth Circuit[3] in *U. S. v. Jackson*, 448 F.2d 539, 542–43 (5th Cir.) *cert. denied* 404 U.S. 1063, 92 S.Ct. 750, 30 L.Ed.2d 752 (1972), and *U. S. v. Gassaway*, 456 F.2d 624, 626 (5th Cir. 1972), that such a refusal is not an abuse of discretion. Other circuits agree.[4]

IX. Instructions to jury on entrapment

■ The jury instruction on entrapment is set out in the margin.[5] Natale and Vadino objected and asked the court to instruct that the burden of proving that they were *not entrapped* was on the government. The paragraph beginning "if, then, the jury should find ..." says, paraphrasing, that if the jury finds beyond reasonable doubt that defendants were predisposed and that governmental participation was no more than the offer of an opportunity, then defendants were not entrapped. The next paragraph says, paraphrasing, that if the evidence leaves the jury with reasonable doubt whether defendants were predisposed, then they are to be found not guilty.

Defendants rely upon *U. S. v. Wolffs*, 594 F.2d 77 (5th Cir. 1979), in which the court

reversed for a faulty charge on entrapment. In the *Wolffs* entrapment instruction, however, the court mentioned neither the reasonable doubt quantum of proof nor the party who bore that burden. In this case the court twice referred to the reasonable quantum of proof of predisposition but did not, within the entrapment instruction, refer to the party having the burden. The court, however, gave a general instruction on burden of proof, told the jury to consider the charge as a whole, and instructed that "the law does not require a defendant to prove his innocence or produce any evidence at all."

While it would have been better to include within the entrapment instruction itself an instruction on burden of proof, the jury instruction considered as a whole was sufficient.

X. Miscellaneous issues

Other issues may be disposed of summarily, some without comment.

■ In testimony DEA agents referred at times to appellants as "traffickers," "violators" and "conspirators" and the group as the "Natale organization." To the extent these descriptions were subject to objection at all, they were clearly not reversible.

---

**3.** *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (all Fifth Circuit cases decided before close of business September 30, 1981 binding on Eleventh Circuit).

**4.** *Gorin v. U. S.*, 313 F.2d 641 (1st Cir. 1963); *U. S. v. Gore*, 435 F.2d 1110 (4th Cir. 1970); *Ross v. U. S.*, 374 F.2d 97 (8th Cir. 1967).

**5.** Certain defendants assert that they were victims of entrapment as to the offense charged in the indictment.

Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents, or informants, to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that Government agents provide what appears to be a favorable opportunity is not entrapment.

For example, it is not entrapment for a Government agent to pretend to be someone else, and to offer, either directly or through an informer, or other decoy, to engage in an unlawful transaction.

If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the Government, then it is your duty to find him not guilty.

Even if the matter was properly raised, it was not error for the court to grant the jury's request to rehear taped conversations between agents and defendants but to deny the jury's request for written transcript of testimony of agents.

Comesana's argument that opening statements of counsel for Natale and Vadino, see part V, *supra*, were comments upon his Fifth Amendment right to remain silent is totally meritless.

The convictions are AFFIRMED.