UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony Nicholas CARRION and Fred
Solmor, Defendants-Appellants.

No. 86–1268.

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 1987.

Rehearing Denied March 27, 1987.

Charles Louis Roberts, Joseph Abraham, Jr., El Paso, Tex., for Solmor.

Michael J. Brown, Houston, Tex., for Carrion.

Wm. Kim Wade, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Robert R. Smith, Asst. U.S. Atty., Dallas, Tex., for U.S.

Before WISDOM, JOHNSON, and GARWOOD, Circuit Judges.

JOHNSON, Circuit Judge:

Defendant Anthony Nicholas Carrion appeals his conviction, arguing that the district court should have instructed the jury on the issue of entrapment. Defendant Fred Solmor appeals his conviction, arguing that the district court erred in imposing consecutive sentences for possession with intent to distribute and distribution, in denying severance of the two defendants' trials, and in failing to suppress certain evidence. Solmor also argues that the evidence was insufficient to sustain his conviction under the Travel Act (18 U.S.C. § 1952). We affirm both convictions.

I. FACTS AND PROCEDURAL HISTORY

In July 1985, an undercover agent with the Drug Enforcement Administration (DEA) introduced defendant Anthony Carrion to Robert Paiz, another DEA undercover agent, at a Dallas nightclub. During that evening, Carrion mentioned to agent Paiz that he was involved in cocaine distribution back home in Los Angeles, California. Carrion indicated that he was capable of procuring multiple ounces of cocaine, possibly up to one or two kilograms, and

gave Paiz a Los Angeles telephone number with which to contact him if Paiz was interested in pursuing a cocaine venture.

Some weeks later, agent Paiz called Carrion, using the Los Angeles number, and asked whether Carrion could organize a cocaine delivery in Dallas. Carrion said that he was more comfortable dealing in the Los Angeles area, but Carrion did encourage Paiz to call him again. When Paiz called again, he left his telephone number on Carrion's answering machine. Carrion used this number to call Paiz. Paiz and Carrion exchanged further telephone calls; sometimes Paiz initiated the call, sometimes Carrion did. In these telephone conversations, Carrion indicated that only a deal involving at least one kilogram of cocaine would make it worth his while to make a delivery in Dallas. Amounts as great as three kilograms were also discussed.

On October 13, Carrion called Paiz from Los Angeles and told Paiz that he would be travelling to Dallas the next day with one kilogram of cocaine. The next day, October 14, the two men met at a Dallas nightclub and Carrion provided Paiz with a cocaine sample. Paiz wanted to test the sample's purity, and the two men parted with the understanding that they would resume their discussion the next day. The following day, October 15, Carrion called Paiz, the two men met, and Carrion delivered one kilogram of cocaine to Paiz for $42,000. During the transaction, Carrion informed Paiz that his sources had some 150 kilograms of cocaine at their disposal and advised Paiz to travel to Los Angeles if he wanted to deal in larger quantities. Carrion also stated that he could provide heroin as well. Carrion noted that his sources would permit him to travel to Dallas with only one kilogram. If Paiz wanted larger quantities, Paiz would have to travel to Los Angeles; in Los Angeles, Carrion was not subject to a one kilogram restriction. The two men parted with the understanding that they would continue to do business with one another in the future.

Carrion returned to California. The two men continued to stay in contact by telephone. In some of these conversations, Carrion asked if Paiz wanted to purchase more cocaine. Eventually, Paiz inquired whether Carrion could deliver six to eight kilograms of cocaine. It was agreed that Carrion would deliver eight kilograms to Paiz in Los Angeles. In late November 1985, Paiz travelled to Los Angeles, but the two men were unable to meet.

On December 4, Carrion informed Paiz by telephone that he had received authority from his sources to travel to Dallas with as many as ten kilograms of cocaine. Carrion said he would be driving to Dallas with a friend. Paiz objected that the price had been jacked up over the price set for the Los Angeles delivery that had fallen through and indicated that he could finance only six kilograms. Carrion offered to see whether his sources would permit a sale on credit of two extra kilograms beyond the initial six. On December 6, Carrion called Paiz to announce his arrival in Dallas. Carrion explained that he had flown to Dallas and that his sources had had an associate drive the so-called load vehicle to Dallas. Carrion told Paiz the name of his hotel and his room number. The load vehicle arrived late in the evening of December 6.

On the morning of December 7, DEA agent Dennis Michael Harrington set up surveillance of the hotel at which Carrion had said he was staying. Agent Harrington observed a van with California plates in the hotel parking lot. He saw defendants Carrion and Fred Solmor exit the hotel and enter the van. Harrington followed the van. Solmor was driving. Defendants drove to two gas stations and an auto parts store. Harrington saw Carrion and Solmor moving, at various times, about the van's interior. They were concentrating on an area behind the front seats called the headliner. The defendants were seen applying a tool to a latch in the headliner area. Harrington followed the van as it returned to the hotel. The defendants left the van and entered the hotel. Solmor carried a medium-sized dark brown luggage piece

from the van. Later, Carrion exited the hotel alone, carrying a smaller dark suitcase, and drove away in a white car.

Carrion arrived at Paiz's undercover apartment at approximately 1:25 in the afternoon of December 7. Carrion brought only three kilograms of cocaine to the apartment, explaining that it was safer this way "if they grab us." Because of his earlier conversations with Carrion, Paiz was confident that Carrion had more than three kilograms with him in Dallas. Knowing that Carrion would be arrested once delivery of any amount had been made, Paiz tried unsuccessfully to talk Carrion into delivering the full quantity—the three kilograms and all additional amounts—at one time. During their conversation, Carrion indicated that he had to be back by 2:30 that afternoon. Carrion delivered the three kilograms to Paiz. The transaction lasted some twenty to twenty-five minutes. Carrion was then placed under arrest.

Once agent Harrington, still at the hotel, knew that Carrion had been arrested, he went about locating Solmor. Hotel personnel supplied the numbers of rooms Solmor could have been occupying. Harrington and another agent Gene Gee went to one of the hotel rooms listed. Harrington identified himself to a housekeeping employee in the hallway and asked him to knock on the door of the room and check whether anyone was in the room. The employee knocked, saying, "Housekeeping." Solmor opened the door. Harrington and Gee recognized Solmor immediately. Gee drew his weapon, pointed it at Solmor, and ordered him to raise his hands. Solmor immediately raised his hands and said to the agents: "I won't give you guys any trouble. I've got a gun in my right pocket." Both agents, with their weapons drawn, entered the room. Agent Gee removed Solmor's gun, and Harrington performed a pat-down search, removing a billfold and an address book from Solmor's pocket. Gee then advised Solmor that he was under arrest.

The bathroom and an adjoining room were checked to make sure there were no other persons on the premises. A woman and two children were in the adjoining room. The agents tried unsuccessfully to obtain Solmor's consent to a search of his hotel quarters. The agents, joined by other agents, secured Solmor's hotel room and the adjoining room. Solmor was then taken away. The woman and children moved, with their personal belongings, into another room in the hotel. Another agent then prepared an affidavit with which to obtain a search warrant. A federal magistrate issued search warrants authorizing searches of Solmor's hotel room and the adjoining room. The warrants were executed approximately five to six and one-half hours after the initial entry into Solmor's hotel room. Five kilograms of cocaine were found in a suitcase in the closet of Solmor's hotel room.

A seven-count superseding indictment was issued against Carrion and Solmor. Count I charged both men with conspiring on or about December 7, 1985, to distribute more than one kilogram of cocaine. Count II charged Carrion with distributing cocaine on or about October 14, 1985. Count III charged Carrion with distributing one kilogram of cocaine on or about October 15, 1985. Count IV charged that both men, aided and abetted by one another, possessed eight kilograms of cocaine on or about December 7, 1985, with the intent to distribute it. Count V charged (1) Carrion with distributing three kilograms of cocaine on or about December 7, 1985, and (2) Solmor with aiding and abetting that distribution. Count VI charged Carrion with travelling in interstate commerce on or about October 14, 1985, with the intent to promote and to distribute the proceeds of an unlawful activity. Finally, count VII charged both defendants with travelling in interstate commerce on or about December 5, 1985, with the intent to promote and to distribute the proceeds of an unlawful activity.

Both defendants were convicted on all counts against them.

## II. DISCUSSION

### A. *Appeal of Defendant Carrion*

■ Carrion contends that the district court erred in declining to charge the jury

on the issue of entrapment. We detect no error.

In *United States v. Stanley*, 765 F.2d 1224 (5th Cir.1985), the Court canvassed the principles governing the trial court's decision whether to instruct on entrapment:

> The defendant has the initial burden of coming "forward with evidence 'that the Government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it.' " If the defendant fails to carry the burden of the entrapment issue forward, he is not entitled to have the issue submitted to the jury. On the other hand, once the defendant has met this burden, the government must, if it is to prevail, prove beyond a reasonable doubt that the defendant was predisposed to commit the offense charged.

*Id.* at 1234–35 (citations omitted; quoting *United States v. Webster*, 649 F.2d 346, 349 (5th Cir.1981) (en banc)); *see also United States v. Nations*, 764 F.2d 1073, 1079–80 (5th Cir.1985). From the very beginning of his contact with agent Paiz, Carrion demonstrated that he was a person ready to deal in cocaine. At their first meeting, Carrion made clear that his " 'occupation, experience and background,' " *Stanley*, 765 F.2d at 1234 (quoting *Pierce v. United States*, 414 F.2d 163, 168 (5th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969)), was cocaine distribution. He explained that he could procure amounts as large as two kilograms and left his telephone number in case Paiz was interested in a cocaine venture. If Paiz later initiated telephone calls, so did Carrion. In this way and many others set forth in the statement of the facts, Carrion exhibited, throughout his interaction with Paiz, his readiness to deal in cocaine. We conclude that Carrion was not entitled to an entrapment instruction because the evidence did not "provide a basis for a reasonable doubt on the ultimate jury entrapment issue of whether criminal intent originated with the government." *Nations*, 764 F.2d at 1080.

Carrion tends to argue that the Government converted a small-time dealer into a big-time dealer. Even if it is assumed that the argument could, despite the concession of predisposition to commit crime, have validity under extraordinary circumstances, Carrion's reliance upon the argument in this case is misplaced. Carrion, who told Paiz at their first meeting that he was capable of procuring up to one or two kilograms of cocaine, cannot be characterized as a small-time dealer. Moreover, the initial difficulty in dealing in yet larger amounts resulted, not from any reluctance or hesitation on Carrion's part, but from the conditions placed on Carrion by his sources, limiting him to undertaking bigger deals in the Los Angeles area. Carrion was prepared to deliver quantities even greater than one or two kilograms in Los Angeles. Having missed Paiz when Paiz travelled to Los Angeles for an eight kilogram deal, Carrion managed to have the Los Angeles restriction lifted so that he could travel to Dallas with as many as ten kilograms.

### B. *Appeal of Defendant Solmor*

#### 1.

Solmor argues, citing *United States v. Hernandez*, 591 F.2d 1019 (5th Cir.1979) (en banc), that the district court erred in imposing consecutive sentences for possession on or about December 7, 1985, of eight kilograms of cocaine with intent to distribute it (count IV) and for aiding and abetting Carrion's distribution on or about December 7, 1985, of three kilograms of cocaine (count V).[1] The contention is unfounded.

In *Hernandez*, the defendant was convicted both of possession with intent to distribute and of distribution. *Hernandez*, 591 F.2d at 1020. The Court observed that the "defendant was never shown to have had actual possession of the controlled substance but constructive control during the course of the transaction was proved by the acts of his co-defendant," a sale of heroin to undercover agents. *Id.* "The

---

**1.** Both counts cite 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

evidence of the sale was relied upon to prove both [defendant]'s constructive possession of the heroin and his intention to distribute it. There was no evidence of [defendant]'s possession of a controlled substance with intent to distribute it apart from the evidence of the actual sale." *Id.* at 1022. The Court concluded, "When the intent to distribute was executed by a successful sale, the possession with intent to do so merged into the completed offense." *Id.* The Court affirmed the conviction, but vacated one of the sentences. *Id.* at 1020, 1022. The *Hernandez* Court was careful to note that its "opinion [did] not concern the situation where there is separate evidence of possession with intent to distribute and evidence of distribution in one or more different transactions." *Id.* at 1022 (footnote omitted).

Later cases have shown that consecutive sentences for the two offenses (possession with intent to distribute and distribution) may be imposed when there is "independent evidence of [the defendant's] prior possession of the [contraband] before the actual time of distribution." *United States v. Berkowitz,* 662 F.2d 1127, 1141 (5th Cir. Unit B 1981) (footnote omitted); *see also United States v. Hernandez,* 750 F.2d 1256, 1259–60 (5th Cir.1985); *United States v. Foundas,* 610 F.2d 298, 301–02 (5th Cir.), *amended on other grounds,* 615 F.2d 1130 (5th Cir.1980). In the present case, there was evidence tending to show that Solmor had driven a van containing eight kilograms of cocaine from California to Texas before Carrion's delivery on the afternoon of December 7. Further, there was evi-

dence tending to show that this cocaine was in the van driven by Solmor on the morning of December 7 before Carrion's delivery. This evidence, all of it independent of Carrion's delivery, when taken together with the equally independent evidence of the five kilograms seized in Solmor's hotel room, permits an inference of Solmor's prior possession of the eight kilograms.[2] Finally, the large quantity is evidence, also independent of Carrion's delivery, of Solmor's possession *with intent to distribute.* See *Berkowitz,* 662 F.2d at 1141 n. 16.

### 2.

Solmor also argues that the district court erred in failing to grant his motion to sever his trial from Carrion's trial. Solmor argues that Carrion's anticipated defense of entrapment conflicted with Solmor's own defense, that is, general insufficiency of the evidence. Generally, to "compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Romanello,* 726 F.2d 173, 177 (5th Cir.1984) (citations omitted).

This case does not present for decision the asserted irreconcilability per se, as it were, of the entrapment defense and the defense of insufficiency of the evidence.[3] Although Carrion's counsel anticipated, as

---

**2.** The seized items are likewise independent evidence of Solmor's possession of five kilograms simultaneous with and following Carrion's delivery.

**3.** For cases touching upon the issue, see generally *United States v. Salomon,* 609 F.2d 1172, 1175 (5th Cir.1980) ("Clearly, a co-defendant's reliance on a theory of entrapment cannot of itself justify reversing a trial court decision not to sever"); *United States v. Vadino,* 680 F.2d 1329, 1335–36 (11th Cir.1982) (same), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983); *United States v. Eastwood,* 489 F.2d 818, 822 (5th Cir.1973) ("The failure to grant a severance merely because one co-defendant is

relying on a defense of entrapment while another is not does not of itself constitute an abuse of discretion"); *United States v. Russo,* 455 F.2d 1225, 1227 (5th Cir.) ("The fact that a codefendant, charged as a coconspirator, pleads entrapment does not alone require the trial judge to serve [*sic*] all others charged with the conspiracy"), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); *cf. United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983) (one defendant's defense of insufficiency of the Government's evidence not irreconcilable with defense of second defendant "who admitted the acts charged but claimed that he was working as a government informant").

evidenced by his opening statement, making the entrapment defense, in the end the district court, as noted, declined to instruct the jury on the issue of entrapment and Carrion's counsel was thereby foreclosed from promoting the entrapment defense in his closing argument.

Solmor also tends to argue that certain statements made by Carrion's counsel during his opening and closing statements prejudiced Solmor.[4] In his opening statement, Carrion's counsel, anticipating making an entrapment defense, asked the jury to pay attention to "the enticement that the Government [had] utilized in causing a crime to be committed." Here, Carrion's counsel spoke only generally, but at one point, he specified that there had been "substantive crimes on the date of October the 15th and then December the 7th." In his closing statement, Carrion's attorney again argued that Carrion had been "directed into ... committing criminal acts by the Government." Again, he specified at one point that the Government had "caused 6 or 8 kilos to be distributed."

Throughout his opening and closing statements, counsel for Carrion maintained his focus exclusively on Carrion. Under these circumstances, the statements that a crime had been committed on December 7 and that six or eight kilograms had been distributed directly implicated Carrion, not Solmor. *Cf. United States v. Vadino*, 680 F.2d 1329, 1336 (11th Cir.1982) (counsel for two defendants, in admitting matters in prosecution's opening statement, "qualified their statements as being applicable to only their respective clients"), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). Moreover, the crimes charged in three (counts IV, V & VII) of the four counts naming both defendants are crimes Carrion could have committed whether or not Solmor had committed a crime. Only an admission by Carrion's attorney that Carrion had committed the conspiracy in count I would tend to imply that Solmor, too, had committed at least physical activity showing conspiracy. Carrion's counsel was not so specific, however, and the logic of this rather abstract implication, if any, of Solmor under count I was nowhere spelled out for the jury. Further, Carrion's attorney made no affirmative statements implicating Solmor, a circumstance the courts have often looked for in reviewing severance denials for prejudice. *See Romanello*, 726 F.2d at 181; *Vadino*, 680 F.2d at 1335; *United States v. Sheikh*, 654 F.2d 1057, 1065 (5th Cir.Unit A 1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Russo*, 455 F.2d 1225, 1227 (5th Cir.), *cert. denied*, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972). The district court instructed the jury that the statements of lawyers are not evidence and that the Government had the burden of proving the guilt of each defendant. *See Vadino*, 680 F.2d at 1336. Under these circumstances, the "question of [Solmor's] guilt depended," not on the statements by Carrion's attorney, but "on the prosecutor's success in establishing that [Solmor] had also participated." *United States v. Ramirez*, 710 F.2d 535, 546 (9th Cir.1983).

▬▬ Only upon a showing of compelling prejudice may the trial judge's denial of severance be reversed. *Sheikh*, 654 F.2d at 1065; *United States v. Eastwood*, 489 F.2d 818, 822 (5th Cir.1973). A denial of severance is reviewed for abuse of discretion, *Berkowitz*, 662 F.2d at 1135; *Sheikh*, 654 F.2d at 1066: We cannot say that we are left with a definite and firm conviction that the district court abused its discretion.[5]

---

4. *See Ramirez*, 710 F.2d at 546 (considering defendant's contention that co-defendant's "use of the 'informer' defense severely prejudiced [defendant] even if the defenses were not mutually exclusive").

5. Solmor also tends to complain that there was "heavy evidence" against co-defendant Carrion. "Although in some circumstances great dispari-

ties in the weight of the evidence against different defendants may, in the presence of other indicia of jury confusion, reveal sufficient prejudice to require severance ..., merely '[d]emonstrating that the evidence is stronger against a co-defendant than oneself does not satisfy the burden of showing *compelling* prejudice.' " *Berkowitz*, 662 F.2d at 1135 n. 8 (quoting *United*

**3.**

██ Solmor contends that the evidence was insufficient to show a continuous course of conduct and that his conviction of a Travel Act (18 U.S.C. § 1952) violation under count VII must therefore fall. The contention is unfounded.

The essential elements of a Travel Act violation are travel in interstate commerce, specific intent to promote, manage, establish, or carry on "unlawful activity," or to distribute the proceeds of unlawful activity, and knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel.

*United States v. Cauble,* 706 F.2d 1322, 1351 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). Section 1952(b) states that *unlawful activity* embraces "any business enterprise involving ... narcotics or controlled substances." Moreover, the "term 'business enterprise' as it is used in section 1952 means 'a continuous course of conduct, rather than sporadic casual involvement in a proscribed activity.'" *United States v. Davis,* 666 F.2d 195, 202 n. 10 (5th Cir.Unit B 1982) (quoting *United States v. Cozzetti,* 441 F.2d 344, 348 (9th Cir.1971)).

██ In the present case, there was evidence tending to show three deliveries of cocaine: on October 14 and 15 (by Carrion) and December 7 (by Carrion, aided and abetted by Solmor). There was also evidence tending to show that Carrion had distributed cocaine in the past. *See United States v. Corbin,* 662 F.2d 1066, 1073 (4th Cir.1981). Further, a reasonable jury could infer from the evidence that there was a drug distribution enterprise headquartered in California and that the above transac-

tions, including the December 7 delivery aided and abetted by Solmor, were part of that enterprise. Finally, there was evidence tending to link Solmor, not only to Carrion, but to the "sources" behind Carrion. We have no difficulty concluding that the evidence sufficiently established a continuous course of conduct. Moreover, we reject any implication by Solmor that only direct evidence of multiple deliveries personally undertaken by or aided and abetted by him would suffice to sustain his Travel Act conviction. It suffices that the December 7 delivery was shown to be part of a continuous business enterprise. By promoting that delivery, Solmor was promoting the enterprise of which it was a part.[6] *See United States v. Kendall,* 766 F.2d 1426, 1434–35 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986).

**4.**

Finally, Solmor contends that the district court should have suppressed on fourth amendment grounds evidence of the items seized during Solmor's arrest and evidence of the five kilograms and related items seized later at the time the search warrant was executed on Solmor's hotel quarters. We hold that the evidence was properly admitted.

In *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1374–75, 63 L.Ed.2d 639 (1980), the Supreme Court held "that the Fourth Amendment to the United States Constitution ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." The *Pay-*

States v. Marable, 574 F.2d 224, 231 (5th Cir. 1978) (emphasis in *Marable* original)). Here, there was no indication of jury confusion, and though the evidence against Carrion was strong, the evidence against Solmor was overwhelming as well.

**6.** We also reject Solmor's argument that § 1952 requires continuous interstate travel and that travel from California to Texas is insufficient. "The statute requires only that the business en-

terprise be continuous, not that the interstate travel be continuous." *United States v. Kaiser,* 660 F.2d 724, 731 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982), *rejected on other grounds, United States v. De Bright,* 730 F.2d 1255 (9th Cir.1984); *see United States v. Craig,* 573 F.2d 455, 489 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978).

*ton* warrant requirement applies [7] to guest rooms in commercial establishments. *United States v. Baldacchino,* 762 F.2d 170, 175–76 (1st Cir.1985); *United States v. Newbern,* 731 F.2d 744, 748 (11th Cir.1984); *United States v. Jones,* 696 F.2d 479, 486–87 (7th Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). In the present case, agents Harrington and Gee arrested Solmor without a warrant.

■ Solmor's arrest in this case was not in violation of the *Payton* warrant requirement since the arrest was effected before the agents entered Solmor's hotel room and Solmor had no protectible expectation of privacy at the time the arrest was effected. When agents went to Solmor's room they had probable cause to arrest,[8] their investigation had focussed on Solmor, and it was their subjective intent to arrest him. Most important, when agent Gee drew his weapon, aiming it at Solmor, and ordered him to raise his hands, Solmor must have understood that he was under arrest. *See generally United States v. Morin,* 665 F.2d 765, 769 (5th Cir.1982). Thus, Solmor's arrest occurred as he stood in the doorway of his hotel room and was first confronted by agents Harrington and Gee, who were standing in the hallway. *See United States v. Johnson,* 626 F.2d 753, 755–56 (9th Cir.1980), *judgment aff'd,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Under this Court's decision in *United States v. Mason,* 661 F.2d 45 (5th Cir.1981), Solmor had no protectible expectation of privacy at the open door to his hotel room. In *Mason,* a law enforcement agent had arrested the defendant Mason's common law wife or paramour Mitchell. "Accompanied by three colleagues, the agent then took Mitchell to the house where she and Mason were living. The agents had neither an arrest or search warrant. ... Mason came to the front door as Mitchell and the agents approached the house." *Mason,* 661 F.2d at 46–47. The defendant Mason was arrested at the door. The *Mason* Court concluded that the defendant had been "permissibly arrested at the front door," noting that the "Supreme Court [had] found such a warrantless arrest consistent with the fourth amendment in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)," because the "defendant in *Santana* [had been] in a public place and had no protectible expectation of privacy." *Id.* at 47.[9]

■ Under the foregoing analysis, Solmor's warrantless arrest was legal. The search of Solmor's person at the time of arrest was therefore a lawful search incident to arrest, *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), and the items found on Solmor's person were thus admissible evidence. Whether the agents' entry into and their limited security search of Solmor's hotel quarters violated the fourth amendment is a question we need not consider. The evidence later seized upon execution of the search warrant was admissible against

---

**7.** At least in the absence of a showing by the Government that the defendant "was a trespasser in the inn or had no legitimate privacy interest in the room in which he was arrested." *United States v. Baldacchino,* 762 F.2d 170, 175 (1st Cir.1985). The Government in this case has made no such showing. The record indicates, moreover, that Solmor was a guest of the hotel in his own quarters.

**8.** *Infra* note 10.

**9.** The *Santana* defendant had been "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Santana,* 427 U.S. at 40 n. 1, 96 S.Ct. at 2408 n. 1. The *Mason* opinion yields no such exact specification of the defendant Mason's location at the time of his doorway arrest. By declining to require any such exact showing, the *Mason* Court, it seems clear, regarded Mason's location at the open front door as a public place even if his feet were planted slightly back of the door frame. This ruling of the *Mason* Court enjoys the support of *United States v. Whitten,* 706 F.2d 1000, 1015 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), but it is by no means uncontroversial, *see United States v. Morgan,* 743 F.2d 1158, 1166 n. 2 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *see generally* 2 W.R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.1, at 159 nn. 61.5 & 61.6 (1978 Supp.1986).

Solmor under the Supreme Court's decision in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), even if the agents' initial entry and security search were illegal.

In *Segura,* law enforcement agents, having arrested the defendant Segura in the lobby of his apartment building, went to his apartment and entered it with Segura, without requesting or receiving permission. Four persons were in the apartment, among them defendant Colon who was also arrested. The agents conducted a limited security check to ensure that no one else was in the apartment who might pose a threat to their safety or destroy evidence. Segura, Colon, and the other occupants were taken to DEA headquarters. Agents then remained in the apartment for some nineteen hours until a search warrant had been issued. *Segura,* 104 S.Ct. at 3383–84.

The Supreme Court did not review whether the initial warrantless entry and limited security search were illegal as the courts below had determined. *Id.* at 3385. Instead, the Court concluded first that,

assuming that there was a *seizure* of all the contents of the petitioners' apartment when agents secured the premises from within, that seizure did not violate the Fourth Amendment. Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its con-

tents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* at 3382–83 (footnote omitted; emphasis in original). Second, the Court held

that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence.

*Id.* at 3383.

▮ The *Segura* decision controls the present case. The securing operation, which followed Solmor's arrest, the entry, and the limited security search, was based on probable cause[10] and merely preserved the status quo for some five to six and one-half hours—a period shorter than the nineteen hours in *Segura*—until a search warrant was obtained.[11] Under the terms of *Segura*'s first holding, this securing operation, although it may have been a seizure, was not an unreasonable seizure.[12]

---

**10.** Solmor does not seriously contend that the agents lacked probable cause. The district court found probable cause. The "trial court's findings of fact on a motion to suppress must be accepted unless clearly erroneous." *United States v. Duckett,* 583 F.2d 1309, 1313 (5th Cir. 1978); *see also United States v. Edmondson,* 791 F.2d 1512, 1514–15 (11th Cir.1986). Applying that standard, we conclude that the agents had probable cause to arrest Solmor and to enter his hotel quarters. Further, there was probable cause for the search warrant later issued. Moreover, we note that, except for a few insignificant particulars, "the information on which [the search warrant] was based [was] unrelated to the entry," *Segura,* 104 S.Ct. at 3383, into Solmor's hotel quarters, a fact significant for the remainder of this opinion's analysis.

**11.** There was no affirmative finding that the agents in the present case acted in good faith, one of the particulars of the *Segura* holding. *Segura,* 104 S.Ct. at 3383 (referring to securing premises "while others, in good faith, are in the process of obtaining a warrant"). Nor was there any such affirmative finding in *Segura. Id.* at 3397 (Stevens, J., dissenting). We note that Solmor, *in his arguments before this Court,* has not raised the absence of findings on the issue. Further, the record is devoid of any indication that the agents were acting with less than good faith.

**12.** The securing operation in this case, of course, affected the interests of the woman and children who were in the room adjoining Solmor's room at the time of the entry and who later moved to another room in the hotel. In

■ Finally, even if it is assumed[13] that the initial entry into and security search of Solmor's hotel quarters were illegal, the evidence discovered during the warrant search of Solmor's quarters was nonetheless admissible under the terms of *Segura*'s second holding because the information underlying the warrant was, as we have noted,[14] unrelated to the entry. *Segura*, 104 S.Ct. at 3383. In *Segura*, the district court had found causation between the initial illegality and the later discovery of the evidence. The *Segura* Court disputed this finding, but held that, even if causation were conceded, it was too attenuated to justify suppression of the evidence. *Id.* at 3392. Here, the district court has made no findings on causation. Under this Circuit's case law, this circumstance might call for a remand. *See United States v. Cherry*, 759 F.2d 1196, 1212 (5th Cir.1985). Nevertheless, the plausible theories of causation in the present case are no different from those in *Segura*.[15] In light of *Segura*'s conclusion on attenuation, suppression of the evidence would be unwarranted even if the district court were to find causation. We, therefore, decline to order a remand on the issue of causation.

## III. CONCLUSION

Both the conviction of defendant Carrion and the conviction of defendant Solmor are

AFFIRMED.

*Segura*, there were four occupants in Segura's apartment at the time of the entry in that case. Apparently, only one of the four, that is, defendant Colon, was arrested. *See Segura*, 104 S.Ct. at 3383–84, 3390.

This circumstance had no apparent bearing on the *Segura* decision. Instead, the Supreme Court conspicuously focussed its attention alone on the interests of the defendants Segura and Colon, who had moved for suppression. *E.g., id.* at 3390. We must conclude that Solmor has no standing to raise, for the purpose of suppressing evidence against him, any violation of the interests of unidentified third parties initially present at the time of the securing operation. *See generally United States v. Hunt,* 505 F.2d 931, 939 (5th Cir.1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *United States v. Altizer,* 477 F.2d 846, 846 (5th Cir.

1973); *United States v. Baucom,* 611 F.2d 253, 255 (8th Cir.1979); *United States v. Riquelmy,* 572 F.2d 947, 952 (2d Cir.1978); *United States v. Barber,* 557 F.2d 628, 634 (8th Cir.1977).

13. *See United States v. Fitzharris,* 633 F.2d 416, 420 (5th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981).

14. *Supra* note 10.

15. *Segura,* 104 S.Ct. at 3384: "The District Court reasoned that this evidence would not necessarily have been discovered because, absent the illegal entry and 'occupation' of the apartment, Colon might have arranged to have the drugs removed or destroyed, in which event they would not have been in the apartment when the warrant search was made." *See also id.* at 3392.