**UNITED STATES of America**

v.

**Gene Allen HERROLD.**

**No. 3:CR–91–071.**

United States District Court,
M.D. Pennsylvania.

July 23, 1991.

1484

George Rocktashel, Asst. U.S. Atty., Lewisburg, Pa., for U.S.

D. Toni Byrd, Asst. Federal Public Defender, Harrisburg, Pa., for Gene Allen Herrold.

## OPINION

MUIR, District Judge.

### I. Introduction.

On April 9, 1991, the grand jury sitting at Scranton returned a two-count indictment charging Gene Allen Herrold with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g) and 924(e)(1) and with possession of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).

On April 26, 1991, Herrold appeared before us and entered a plea of not guilty to the charges as set forth in the indictment. On May 28, 1991, Herrold filed a motion to suppress evidence and a brief in support thereof. We held a hearing on the motion to suppress evidence on June 26, 1991. This motion has been fully briefed. The following are the Court's findings of fact, discussion, and conclusions of law with respect to the motion to suppress evidence.

### II. Findings of Fact.

1. Gene Allen Herrold lives at RD # 1, Box 504, Port Trevorton, Pennsylvania. (Undisputed) (hereinafter "U")

2. On August 24, 1990, members of the Region IV Narcotics Strike Force based in State College, Pennsylvania and a confidential informant went to the vicinity of Herrold's residence, a white trailer home with brown trim located approximately 100 feet west of the intersection of Flanders Road and Sholley's Road in Chapman Township, Snyder County, Pennsylvania. (U)

3. The officers had learned from the confidential informant who made the arrangements, as well as from another informant, that Herrold had just obtained a large quantity of cocaine.

4. Before the confidential informant drove to Herrold's residence, the officers strip-searched the informant's person and searched the informant's vehicle, and found no hidden controlled substances. (U)

5. On August 24, 1990, Herrold allegedly sold one-half ounce of cocaine to the confidential police informant. (U)

6. Previously that evening, the confidential informant had made arrangements by telephone with Herrold and a female occupant of the trailer to purchase cocaine.

7. Subsequent to the alleged sale, Herrold was arrested in his home by Pennsylvania State Trooper Kenneth F. Hill who arrested him without first obtaining an arrest warrant.

8. Steve Landis is the confidential police informant who allegedly purchased drugs from Herrold on August 24, 1990. (U)

9. Steve Landis lives at RD # 1, Selinsgrove, Pennsylvania. (U)

10. Trooper Hill is assigned to the Region IV Narcotics Strike Force in State College.

11. Detective Ray C. Gerringer is the Chief Deputy Sheriff and Chief County Detective in Montour County. (U)

12. On August 24, 1990, Ray C. Gerringer was serving in conjunction with the SUN (Snyder, Union, Northumberland) Area Task Force under the supervision of Trooper Hill. (U)

13. Ray C. Gerringer was a member of the surveillance team observing Herrold on August 24, 1990. (U)

14. Sergeant J. Martin Berthelsen is employed by the Mahoning Township Police Department. (U)

15. On August 24, 1990, Sergeant Berthelsen was assigned to the SUN Area Task Force under the supervision of Trooper Hill. (U)

16. On August 24, 1990, Sergeant Berthelsen was a member of the surveillance team observing Herrold's residence. (U)

17. Chief Ramer is employed by Riverside, Pennsylvania, Police Department. (U)

18. On August 24, 1990, Chief Ramer was serving in conjunction with the SUN Task Force under the supervision of Trooper Hill. (U)

19. On August 24, 1990, Chief Ramer was a member of the surveillance team observing Herrold's residence. (U)

20. Detective/Sergeant Thomas Garlock is employed by the Sunbury, Pennsylvania, City Police Department. (U)

21. On August 24, 1990, Sergeant Garlock was serving in conjunction with the SUN Area Task Force under the supervision of Trooper Hill.

22. N. Haas is a Pennsylvania State Trooper. (U)

23. On August 24, 1990, Trooper Haas was assigned to assist the SUN Area Task Force and served under the supervision of Trooper Hill.

24. Robert Avvisoto is a Pennsylvania State Trooper. (U)

25. Trooper Avvisoto was assigned to assist the SUN Area Task Force on August 24, 1990, serving under the direction of Trooper Hill. (U)

26. In 1988, Landis was approached by Trooper Hill and advised that on the basis of certain activities he could be arrested for the possession of illegal drugs.

27. Landis has been working in an undercover capacity as a police informant for Trooper Hill.

28. On Wednesday, August 22, 1990, Landis allegedly met with Herrold and discussed purchasing drugs from Herrold. (U)

29. Herrold and Landis met in Freeburg, Pennsylvania, on August 22, 1990. (U)

30. On August 22, 1990, Landis allegedly gave Herrold $300 for the drugs. (U)

31. On August 22, 1990, Landis and Herrold allegedly arranged to consummate the drug sale on Friday, August 24, 1990. (U)

32. On or about August 22, 1990, Landis telephoned Trooper Hill to advise him of his meeting with Herrold and of the proposed drug transaction on August 24, 1990.

33. The original plan for the drug transaction was for Herrold to bring the drugs to Landis' home in Selinsgrove and to consummate the deal in Selingsgrove, Pennsylvania, on August 24, 1990, at Landis' residence. (U)

34. On August 24, 1990, the surveillance team met between approximately 5:00 and 5:30 p.m. at the Pennsylvania State Police Barracks. (U)

35. On August 24, 1990, Trooper Hill strip-searched Landis at his home prior to proceeding to Herrold's residence.

36. On August 24, 1990, Detective Ray C. Gerringer and Sergeant J. Martin Berthelsen conducted a search of Landis' vehicle prior to proceeding to Herrold's residence.

37. Sergeant Garlock and Chief Ramer, who were in Sergeant Garlock's vehicle, were sitting at an assigned location conducting surveillance near Landis' home. (U)

38. Garlock and Ramer were in radio communication with Trooper Hill or Sergeant Berthelson at all times. (U)

39. On the evening of August 24, 1990, Landis telephoned Herrold. (U)

40. Herrold did not come to the telephone; however, Landis spoke with Herrold's girlfriend, Barbara Crowther. (U)

41. Crowther indicated that she and Herrold would be up to Landis' home shortly. (U)

42. Following this telephone call, Landis related to Trooper Hill the contents of his conversation with Ms. Crowther. (U)

43. Following the telephone call, Trooper Hill determined that the incident, or

drug deal should take place at Herrold's home rather than at the home of Landis.

44. Thereafter, on August 24, 1990, Landis made a second call to Herrold.

45. He did not speak with Herrold but with an older woman and advised her to tell Herrold that Landis would be coming to Herrold's home and to tell Herrold to await his arrival. (U)

46. Subsequently, Trooper Hill notified the other members of the surveillance team who were not with him at Landis' home by radio of the change of location.

47. On August 24, 1990, at approximately 8:09 P.M. Landis drove up to Herrold's residence. (U)

48. The officers observed Landis from surveillance locations in the vicinity of Herrold's trailer. (U)

49. On August 24, 1990, at approximately 8:09 P.M. Herrold exited his residence and got into Landis' automobile. (U)

50. Police officers observed Herrold exit the trailer and enter Landis' vehicle.

51. Trooper Hill was in a stationary position at that time. (U)

52. After Herrold entered Landis' automobile, Trooper Hill followed Landis' vehicle, passed it, got ahead of it, turned around, repassed the vehicle, and returned to his stationary point. (U)

53. Landis and Herrold drove west on Flanders Road and came back approximately one minute later to the residence. (U)

54. Various officers kept the vehicle under surveillance as it travelled except for a very brief period of time.

55. On August 24, 1990, at approximately 8:10 P.M., Landis drove Herrold back to his residence. (U)

56. On August 24, 1990, at approximately 8:10 P.M., Herrold exited Landis' automobile and went into his residence. (U)

57. Thereafter, Landis drove to Trooper Hill's location and allegedly gave Trooper Hill the drugs which Landis had just received from Herrold. (U)

58. Police officers conducted a field test of the substance, which was positive for the presence of cocaine. (U)

59. Landis advised the officers that he had purchased cocaine from Herrold for a total price of $650.

60. Landis also advised the officers that Herrold was planning on going to a bar that evening.

61. Landis had previously that evening told the officers that Herrold had a gun.

62. Landis informed the officers after delivering the cocaine that Herrold had been smoking crack cocaine prior to meeting with him.

63. After Herrold entered his home, the surveillance team was instructed to take positions around the home.

64. At some point when the police were surrounding the trailer a dog barked.

65. There is no evidence that the barking alerted the occupants of the trailer or other individuals in the neighborhood to the presence of the police.

66. Although the officers initially had planned to obtain a search warrant following the undercover purchase of cocaine from Herrold, their plans changed upon learning that Herrold intended to leave the trailer and go out to a bar that evening.

67. With darkness fast approaching, the officers decided to arrest Herrold, based on the sale of cocaine to Landis which had just occurred.

68. The officers based their decision on a number of facts:

(a) Herrold had more cocaine and was going to go to a bar;

(b) The officers knew, based on discussions with Landis that Herrold would very likely take cocaine with him out of the house to the bar for sale to other persons.

(c) Because of the trailer's proximity to neighboring residences, the officers were concerned that they would not be able to maintain an effective surveillance on the residence for the approximately three or four hours they thought it would take to obtain a search warrant or arrest warrant,

without being detected, Herrold alerted, and the evidence destroyed.

69. The officers also knew that Herrold had previously been convicted of two violent felonies involving weapons, specifically armed robberies. (U)

70. Landis had also advised the officers that Herrold was "squirrelly", and that caution should be exercised in dealing with him.

71. At approximately 8:40 P.M. on August 24, 1990, Trooper Hill was in plain clothes. (U)

72. At approximately 8:40 P.M. Trooper Hill approached the front of the trailer home.

73. When Trooper Hill approached Herrold's residence, the door to the residence was closed.

74. As Trooper Hill approached the trailer, several other officers surrounded the residence. (U)

75. When Hill reached the front door of the trailer, he knocked on the door. (U)

76. Herrold came to the door.

77. When Herrold answered the knock at the door he partially opened the door.

78. When Herrold answered the door, his left hand was hidden from Trooper Hill's view.

79. Trooper Hill asked the individual who came to the door if he was "Gene Herrold." Herrold responded that he was not. Trooper Hill then asked him if he knew where Gene Herrold could be found. Herrold said that he did not know. At that point, Hill stated that he was a state trooper, and that Herrold was under arrest.

80. Trooper Hill did not show his badge when he identified himself at Herrold's door. (U)

81. Trooper Hill recognized Herrold's face as the individual who had met with Landis earlier that evening. (U)

82. Herrold attempted to slam the door shut and in so doing refused to permit Trooper Hill to enter his residence.

83. Herrold slammed the door on the trooper's hand. Trooper Hill had placed his hand in the door to stop Herrold from slamming it.

84. Herrold then yelled, "get the fuck out of here."

85. Trooper Hill caught the door with his hand and a tug-of-war ensued with both Herrold and Trooper Hill using one of their hands.

86. Trooper Hill forced the door open and entered Herrold's residence.

87. Herrold then fled down the hallway of the trailer into the living room.

88. As Herrold was fleeing down the hallway, Hill observed an unidentified object in Herrold's hand.

89. Although he could not see what the object was, Trooper Hill suspected that the object was a gun.

90. Trooper Hill yelled in a loud voice for Herrold to surrender, that Hill was a state police officer and that Herrold was under arrest. (U)

91. Eventually, Herrold moved towards the table in the living room, placed the object that was in his hand on that table, and laid down on the floor and submitted to arrest. (U)

92. The object placed on the table was retrieved at that time, and was identified as a .25 caliber Raven Arms semi-automatic pistol, loaded with four live rounds. (U)

93. After Herrold and the weapon were secured, the rest of the trailer was secured, including a female occupant in the bedroom of the trailer, for the officers protection and to prevent the destruction of evidence.

94. While securing the location, the officers observed in plain view several items of cocaine paraphernalia and cocaine cut into lines on top of the dresser in the bedroom, in addition to razors, a plate containing white powder and other paraphernalia in plain view. (U)

95. The officers did not search the location at that time. (U)

96. Officers maintained security over the residence and the two occupants, while Trooper Hill and another officer went to obtain a search warrant. (U)

97. At 11:45 P.M. on August 24, District Justice William D. Yohn issued a search warrant for Herrold's trailer. (U)

98. At 12:50 A.M. on August 25, 1990, Trooper Hill and other officers executed the search warrant at Herrold's residence and recovered additional cocaine and drug paraphernalia.

99. Prior to approaching Herrold's residence, Trooper Hill discussed with other law enforcement personnel the possibility of obtaining a search warrant but elected not to do so before effecting an arrest. (U)

100. Trooper Hill had at least two days to plan the surveillance of Herrold's residence and the operation concerning the purchase of drugs from Herrold.

101. Trooper Hill could have staked out the area prior to the incident and could have found places for officers to hide and watch Herrold's home.

102. Trooper Hill could have found strategic locations where officers could detect Herrold's movements to and from Herrold's home without compromising their positions.

103. Trooper Hill could have placed officers on foot in the area, so that there would be no physical presence of strange automobiles near Herrold's home.

104. If Trooper Hill had made such surveillance plans, the surveillance team would not probably have been detected by neighbors or by Herrold.

105. Herrold was the target of an investigation. (U)

106. Trooper Hill knew prior to the incident approximately where Herrold lived.

107. The planning for the operation took several days.

108. Trooper Hill was aware of Herrold's background prior to the transaction on August 24, 1990. (U)

109. Trooper Hill was aware of Herrold's criminal record prior to August 24, 1990.

110. Trooper Hill had no firm knowledge that Herrold had weapons.

111. The only new facts learned by Trooper Hill on August 24, 1990, were (1) Herrold's plan to go to the Shade Mountain Inn, a bar, later in the evening after the transaction with Landis, (2) the sale of cocaine to Landis on that evening and (3) Herrold's use of cocaine on that evening.

112. Trooper Hill claims that it would have taken three or four hours to obtain an arrest or search warrant. (U)

113. On August 24, 1990, Herrold had known Landis for 15 years and had no knowledge that he was working with the police. (U)

114. On August 24, 1990, Herrold did not know he had just made a sale to a police informant. (U)

115. Herrold did not know that he was being observed prior, during, and after the drug transaction. (U)

116. Trooper Hill had six other officers available on the evening of August 24, 1990, to assist in the operation.

117. Prior to the alleged drug transaction, Trooper Hill had planned to search Herrold's home if the sale to Landis was completed.

118. The surveillance team members were not in immediate physical danger prior to the entry into Herrold's residence.

119. When Trooper Hill approached the trailer and knocked on the door he intended to place Herrold under arrest and enter and secure the trailer pending the issuance of a search warrant.

120. Trooper Hill initially hoped that the drug transaction between Herrold and the confidential informant would take place in Herrold's trailer so that Landis could provide information as to whether other drugs were in the trailer.

121. Herrold was not in the process of or about to destroy evidence when Trooper Hill approached his residence.

122. The items seized in plain view incident to Herrold's arrest were a .25 Caliber Raven Arms semi-automatic pistol, cocaine found on a dresser in the bedroom and cocaine paraphernalia.

## III. Discussion.

■ Herrold moves to suppress the .25 caliber Raven Arms semi-automatic pistol, the cocaine and cocaine paraphernalia found in plain view pursuant to the warrantless arrest of him in his home. Herrold argues that absent exigent circumstances, a warrantless, non-consensual entry into a suspect's home to make an arrest violates the Fourth Amendment to the United States Constitution. Herrold relies on *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton* the Supreme Court held that "the Fourth Amendment has drawn a firm line at the entrance of the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382. Herrold contends there were no exigent circumstances justifying his warrantless arrest.

In contrast the Government argues that the line remains firm only when the occupant remains behind a closed door. The Government contends that Herrold waived his expectation of privacy when he answered the door in response to knocking at the door by Trooper Hill and that when Herrold opened the door and exposed himself to public view, speech, hearing or touch, he in effect entered a "public place" and thus Trooper Hill could effectuate a lawful arrest at that moment. The Government further contends that exigent circumstances were present justifying a warrantless arrest of Herrold in his home.

The *Payton* case was a consolidated appeal involving two defendants. The two defendants were Theodore Payton who was convicted of the murder of a manager of a gas station and Obie Riddick who was convicted of narcotics charges. With regard to Payton, officers went to his apartment intending to arrest him. They had not obtained a warrant. There was no response to their knock on the door. They ultimately used crowbars to break open the door and entered the apartment. Payton was not present. However, a .30 caliber shell casing was seized in plain view and later admitted at trial. With regard to Obie Riddick, a city detective and three other officers went to Riddick's home. They knocked on the door, and when Riddick's young son opened the door, they observed Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest but before permitting him to dress they opened a chest of drawers two feet from the bed in search of weapons and narcotics and found narcotics which were subsequently admitted at his trial. The Supreme Court reversed both convictions.

■ We are of the view that there is no reasonable basis to distinguish *Payton* from the instant case. Herrold's motion must be granted because Herrold was arrested without a warrant in his home when he came to the door in response to Trooper Hill's knock and there were no exigent circumstances justifying this warrantless arrest.

In support of the proposition that Herrold relinquished his expectation of privacy when he opened the door in response to Trooper Hill's knock the Government offers the case of *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). The Government's reliance on *Santana* is misplaced. The *Santana* opinion was issued in 1976 and must be considered in light of the *Payton* opinion that was issued in 1980. Furthermore, the facts in *Santana* are distinguishable from the facts in Herrold's case. In *Santana,* police saw "Mom" Santana standing in the open doorway to her home shortly after a heroin transaction in which they had probable cause to believe she participated. The police pulled their van up near her home, exited the van, identified themselves, and approached to arrest her. She fled into her home; the police followed and arrested her. Because she was not in her home behind closed doors, but in public view when the officers drove up, the Supreme Court held that her arrest was "set in motion in a public place." 427 U.S. at 43, 96 S.Ct. at 2410. The Supreme Court further held that when the police followed her into the vestibule of her home they were engaged in true "hot pursuit" and thus exigent cir-

cumstances were present. *Id.* at 42–43, 96 S.Ct. at 2409–10.

In contrast, Herrold's door was closed when Trooper Hill approached and he had to knock and struggle in order to gain entrance. Unlike, "Mom" Santana, Herrold was not exposed to public view, speech, hearing or touch when Trooper Hill approached Herrold's home to effect an arrest. Herrold's arrest was not set in motion in a public place but in a private and protected place, the home. Because Herrold's arrest was not set in motion in a public place, there was no "hot pursuit" and thus no exigency existed based on that concept.

■ Law enforcement officers may not circumvent the arrest warrant requirement by simply summoning a suspect to the doorway of the suspect's home in order to effect an arrest in a "public place." *United States v. McCraw,* 920 F.2d 224 (4th Cir.1990); *United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

In *McCraw* the Court of Appeals for the Fourth Circuit held that when a person answers a knock at a hotel room door he "does not surrender his expectation of privacy nor consent to the officers' entry by so doing, and that his arrest inside his room under such circumstances is contrary to the fourth amendment and the United States Supreme Court's decision in *Payton v. New York....*" 920 F.2d at 228. In the *McCraw* case, police surveillance indicated that the defendants, McCraw and Mathis, were involved in drug trafficking. McCraw was seen leaving the hotel where Mathis was staying with a suitcase believed to contain drugs. Police arrested McCraw as he attempted to drive away from the hotel garage. After the arrest of McCraw and without obtaining either a search or arrest warrant, the police went to Mathis' hotel room to arrest him. Mathis came to the door in response to the agents knocking, did not completely open the door, and then attempted to shut the door. The officers forced their way into the room to make an arrest.

The issue before the court with respect to Mathis was:

> .... whether officers without an arrest warrant but with probable cause may, absent exigent circumstances, force their way into a hotel room and arrest an occupant who, from inside his room partially opens the door to determine the identity of the officers knocking on the door.

920 F.2d at 228. The Government argued that under *Santana* Mathis' arrest did not violate the Fourth Amendment. The Court of Appeals concluded that *Santana* was inapplicable. Unlike "Mom" Santana, Mathis was not in public view in the threshold of the door to his hotel room upon the arrival of the police officers. He was behind closed doors inside his hotel room.

The *McCraw* Court found that there were no exigent circumstances because Mathis did not know of McCraw's arrest, and he did not know of the officers presence or that his room was under surveillance. He thus had no reason to destroy evidence. Moreover, if he had left his hotel room, he could have been arrested in the hallway which is a public place.

In reaching its conclusion that Mathis' arrest was in violation of the Fourth Amendment the Court of Appeals relied on a recent Supreme Court case, *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) which suggests that the police may not forcibly or coercively gain admittance to a private residence to effect an arrest simply by obtaining the arrestee's presence at the door. In *Harris* police officers with guns drawn knocked on the door of Harris' apartment, Harris looked out of the peephole of the door, one of the officers displayed his badge, Harris opened the door and permitted the officers to enter. The Supreme Court stated: "For present purposes, we accept the finding below that Harris did not consent to the police officers' entry into his home and the conclusion that the police had probable cause to arrest him. It is also, evident, in light of *Payton,* that arresting Harris in his home without an arrest warrant violated the Fourth Amendment." 110 S.Ct. at

1642. The *Harris* Court further explained that *Payton* drew a line at the entrance to the home which the police could not cross without a warrant, absent exigent circumstances. 110 S.Ct. at 1643. *Harris* dealt with suppression of statements. Had it dealt with suppression of physical evidence, it would be controlling here. However, it is strongly persuasive as to what the Supreme Court thought *Payton* meant. In *Harris* the majority declined to apply the exclusionary rule to statements made outside the home after the suspect was arrested in the home without a warrant "because the rule in *Payton* was designed to protect the physical integrity of the home...." 110 S.Ct. at 1640.

In accord with the *McCraw* Court is the Court of Appeals for the Seventh Circuit in the case of *United States v. Berkowitz*, 927 F.2d 1376 (7th Cir.1991). The Court stated:

> *Santana* does not require a different result. As far as reasonable privacy expectations go, there is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on his door. The person who answers the knock and stays within the house is not voluntarily exposing himself "to public view, speech, hearing, and touch as if [he is] standing completely outside [his] house." (Citations omitted.) Moreover, the entry in *Santana* was justified by hot pursuit; Santana had just completed a heroin transaction, she voluntarily relinquished her privacy expectations in her home by exposing herself to the public in her open doorway, the police began the arrest while Santana had no reasonable privacy expectation, and there was a real possibility that delaying her arrest would result in her destroying evidence.... One might argue that to disallow the minimal entry into the home to arrest in this case could hamstring police. But Payton forbids any non-consensual warrantless entry into the home absent exigent circumstances.

927 F.2d at 1388. Likewise, the Court of Appeals for the Sixth Circuit in *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984) held that the warrantless arrest of Morgan after he exited his home, having been summoned by police, violated the Fourth Amendment. In *Morgan*, the police had probable cause to believe that the defendant was in possession of illegal weapons but no exigent circumstances were present. Without first obtaining a warrant, the police traveled to the suspect's house, surrounded it, flooded it with spotlights and called the suspect out with a bullhorn. The suspect came to the door with a pistol in his hand and after exiting the house, he was arrested. The court reasoned Morgan was under arrest when the police surrounded his home. In response to the Government's argument that Morgan's possession of a weapon created an exigent circumstance, the court held that it was the action of the police officers which created the exigency and that the police cannot create an exigent circumstance to justify a warrantless arrest. 743 F.2d at 1163.

In yet another case addressing the issue of "doorway arrests," *United States v. Karagozian*, 715 F.Supp. 1160 (D.Conn. 1989), aff'd 914 F.2d 239 (2d Cir.1990), the Court of Appeals for the Second Circuit affirmed the district court's finding that summoning the suspect onto his deck in the rear of his home and then arresting him without a warrant violated the suspect's Fourth Amendment rights.

The Government relies on *United States v. Carrion*, 809 F.2d 1120 (5th Cir.1987), *United States v. Mason*, 661 F.2d 45 (5th Cir.1981) and *United States v. DeSoto*, 885 F.2d 354 (7th Cir.1989) for the proposition that doorway arrests are permissible. In *Carrion*, the suspect, Solmor, was arrested after he answered his hotel room door in response to a knock. In that case two officers had a housekeeping employee knock on the suspects hotel room door, saying "Housekeeping." The suspect opened the door. The officer recognized the suspect immediately, one of the officers drew his weapon, pointed it at the suspect and ordered him to raise his hands. The suspect immediately raised his hands and

said to the officers: "I won't give you guys any trouble. I've got a gun in my right pocket." *Carrion,* 809 F.2d at 1123, 1128.

Although we are unable to distinguish *Carrion* from the instance case, the Court of Appeals for the Fifth Circuit based its decision on *Santana.* Moreover, it recognized that its interpretation of *Santana* to cover the situation is in question. *Carrion,* 809 F.2d 1128 at n. 9. The *Carrion* Court also relied on *Mason,* another Fifth Circuit case, involving a doorway arrest and *United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983). The *Mason* case is not helpful because the suspect was already standing in the front door of his home when the police arrived and thus *Santana* would apply. The Court of Appeals for the Ninth Circuit in *Whitten* relying on *Santana* stated "[a] doorway ... unlike the interior of a hotel room, is a public place. (Citation omitted.) No warrant was therefore required to make the arrest." 706 F.2d at 1015. In the *Whitten* case the suspect, John Gaiefsky, was arrested in the doorway of his hotel room when he answered a knock at the door. However, we cannot tell from the *Whitten* opinion whether a display of force by the police officers effectuated the arrest or whether the suspect acquiesced in the arrest. This fact is important because the Court of Appeals for the Seventh Circuit in *Berkowitz* suggests that a doorway arrest without a warrant based on the suspect's consent is legal:

> As the Court noted in *Payton,* there is no place where a person's expectation of privacy is greater than in his home. (Citation omitted.) A person does not abandon this privacy interest in his home by opening his door from within to answer a knock. Answering a knock at the door is not an invitation to come in the house. We think society would recognize a person's right to choose to close his door on and exclude people he does not want within his home.... When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home. If the person recognizes and submits to that authority, the arrestee, in

effect, has forfeited the privacy of his home to a certain extent. At that point, it is not unreasonable for the police to enter the home to the extent necessary to complete the arrest. A person who has submitted to the police's authority and stands waiting for the police to take him away can hardly complain when police enter his home briefly to complete the arrest.

927 F.2d at 1387. Moreover, it is important to note that the Court of Appeals in *Whitten* found that even though the arrest was legal the subsequent entry and search of the hotel room and seizure of evidence was unlawful. 706 F.2d at 1016–1017.

We are of the view that to the extent that the *Carrion* and *Whitten* Courts relied on *Santana,* their reliance is incorrect. *See United States v. Morgan,* 743 F.2d at 1166, n. 2. ("To the extent that *Whitten* validates the warrantless arrest of individuals standing in the doorway of a private residence absent exigent circumstances, we believe that this holding is contrary to the rule established in *Payton.*") *Santana* did not hold that a warrantless arrest in a doorway satisfied the Fourth Amendment. It held that retreating from an open doorway upon the arrival of the police was a retreat from a public place and because the defendant retreated after the police identified themselves, there were exigent circumstances. The police were in "hot pursuit" of the defendant who was fleeing from a public place.

Furthermore, *Carrion* and *Whitten* precede the most recent discussion by the Supreme Court in *Harris* of warrantless arrests in the arrestee's home. The *Harris* court clearly reiterated the pronouncement from its earlier holding in *Payton* that a line is drawn at the entrance to the home which police may not breach, absent exigent circumstances. *See Harris,* 110 S.Ct. at 1643.

In *Harris* Justice White delivered the opinion of the Court, in which Chief Justice Rehnquist and Justices O'Connor, Scalia and Kennedy joined. We are of the view that in light of the language of the majority's opinion in *Harris* that the Supreme

Court.would rule that the arrest of Herrold in his home without a warrant violated the Fourth Amendment and would reverse a conviction based on the evidence seized in plain view during the illegal arrest and entry of Herrold's trailer.

With respect to *DeSoto* that case must be interpreted in light of *Berkowitz,* the most recent Seventh Circuit case on the subject. Moreover, the Court of Appeals in *DeSoto* agreed with the district court that the police had probable cause to believe that individuals in the apartment would attempt to destroy evidence. There were exigent circumstances in that case which justified the warrantless arrest and entry.

Therefore in the instant case in order to justify the warrantless arrest and entry into Herrold's residence exigent circumstances had to be present prior to Trooper Hill knocking on the door of the trailer.

The Government bears the burden of demonstrating exigent circumstances. *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Exigent circumstances in connection with a warrantless arrest in a residence "refer to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Morgan,* 743 F.2d 1158, 1169 (1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985). Exigent circumstances which have been recognized as justifying a warrantless arrest include hot pursuit of a fleeing suspect, the risk of destruction of evidence, and threats of physical harm to law enforcement officers or other innocent individuals. *United States v. Velasquez,* 626 F.2d 314, 317 (3d Cir.1980). Whether an exigency exists depends upon the circumstances at the moment the officers make the decision to effectuate a warrantless arrest of the suspect on the premises. Furthermore, there must be objective indicia that an exigent circumstance exists. We are of the view that there were no exigent circumstances present when Trooper Hill made the decision to effectuate a warrantless arrest.

The Government contends that Herrold's warrantless arrest can be justified by fear that evidence would be moved or destroyed and by Trooper Hill's "hot pursuit" of Herrold in Herrold's trailer after Herrold was arrested. In order for police to arrest a suspect based on exigent circumstances, those circumstances must exist prior to the decision to make the warrantless arrest. *See,* e.g. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In this case there was no "hot pursuit." Herrold came to the door in response to Trooper Hill's knocking. Trooper Hill was not pursuing Herrold from a crime scene into his home. *See Welsh v. Wisconsin,* 466 U.S. at 753, 104 S.Ct. at 2099 (hot pursuit is "immediate or continuous pursuit of [the suspect] from the scene of the crime.") Moreover, in this case, it was after Trooper Hill notified Herrold that Herrold was under arrest that Herrold fled down the hall of his home. Trooper Hill was not in "hot pursuit" of a fleeing felon and thus the warrantless arrest cannot be justified on the basis of the exigency of "hot pursuit."

The Government also argues that Trooper Hill's warrantless entry and arrest of Herrold can be justified on the basis of destruction of evidence. The Government offers three justifications: (1) that Herrold was planning on leaving the trailer to travel to a bar to sell his drugs; (2) that the neighbors would notice the presence of the police officers outside Herrold's trailer and call to inform him of the same; and (3) that Herrold would consume the drugs. In practically every drug investigation, there is the possibility that a suspect would leave his residence with the drugs, neighbors would notice the presence of police and alert the occupants of the residence under observation or the suspect could consume the drugs, although we doubt in this case that Herrold or his girlfriend could or would have consumed all of the drugs. Moreover, the argument that Herrold or his girlfriend would have consumed all of the drugs is inconsistent with the Government's argument that he was planning on leaving the trailer to sell the drugs at bars.

The critical point, however, is that all three arguments are based on pure speculation. There is no objective indicia that any of the events was about to happen. It is speculative whether Herrold was going to leave the trailer and if he did the police could have immediately arrested him. Moreover, if Herrold left the trailer and was arrested this fact would have created an exigency to enter and secure the trailer to prevent the possible destruction of evidence if the officer had probable cause that other drugs were located in the trailer and an objective indication that someone remained in the trailer. The arrest of Herrold outside the trailer would have alerted the remaining occupants of the trailer to the police presence. *See United States v. Whitten*, 706 F.2d at 1014.

Trooper Hill's knock on the door created the only danger of destruction of evidence or harm to the police officers. Police officers may not create exigent circumstances in order to circumvent the dictates of *Payton*. In *McCraw* the trial court found that there were no exigent circumstances and the appellate court concurred: "Any risk of destruction of evidence when [the suspect] retreated into his room was precipitated by the agents themselves when they knocked on the door." 920 F.2d at 230.

The recent case of *United States v. Rivera*, 762 F.Supp. 49 (S.D.N.Y.1991) is relevant to the instant case. Two defendants were suspected of operating an ongoing drug business out of their apartment. An undercover agent, posing as a buyer, went into the apartment to buy drugs and was turned away. While standing in the doorway, he noticed what appeared to be several crack vials in the apartment. A second agent gained entrance into the apartment on the pretext of looking for someone in the apartment complex. The second agent saw the vials the first agent had told her about and arrested Rivera and a codefendant. The agents seized two guns and a tinfoil package in plain view from the living room table. A search warrant was subsequently obtained and no additional drugs discovered.

The defendants' motion to suppress evidence was granted because the first undercover agent had probable cause to apply for a warrant after viewing the crack vials. Similarly in Herrold's case Trooper Hill had probable cause to apply for a warrant after the drug deal between Herrold and the confidential informant occurred. As for exigencies, the court found none:

> Apparently, Rivera's apartment was a known drug location, the investigation commenced because of complaints in the neighborhood, and ongoing drug activity had no immediate end point. Considering that this was an ongoing business, conducted over a period of time, there was no articulable exigency requiring an immediate arrest.

762 F.Supp. at 52. The search warrant application and affidavit sworn out by Trooper Hill indicate that Herrold was known to Hill and several other police officers and confidential informants as a drug dealer. Trooper Hill testified that he had been trying to make a buy from Herrold for some time and that he could have planned for Herrold's arrest. This suggests the sort of "ongoing activity with no immediate end point" referred to by the court in *Rivera*. Therefore, the warrantless arrest may not be upheld on the grounds that exigent circumstances were present at the time of Herrold's arrest.

██ Although Trooper Hill may have obtained a valid warrant after arresting Herrold and securing his residence, and although the evidence seized which was "not observed during the initial entry," *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), may be admissible, the evidence observed and seized in plain view during the invalid arrest and security check must be suppressed.

## IV. Conclusions of Law.

1. Based upon the delivery by Herrold of a quantity of substance field-tested positive for cocaine to a police informant, the officers had probable cause to arrest Herrold for the felony offense of delivery of cocaine.

2. Herrold had a protectible expectation of privacy when he opened the front door of his trailer in response to the knocking at the door by Trooper Hill.

3. A warrant was necessary to place Herrold under arrest for delivery of cocaine to the informant when he answered the knock at the door of his trailer.

4. There were no exigent circumstances which justified the warrantless arrest of Herrold in his home on August 24, 1990.

5. Herrold did not consent to the entry of Trooper Hill into his home.

6. The warrantless arrest of Herrold in his home without exigent circumstances violated Herrold's rights under the Fourth Amendment to the United States Constitution.

7. The police officers could have arrested Herrold immediately if he had left the trailer. In so doing, they would not have violated Herrold's Fourth Amendment rights.

8. All items seized in plain view incident to Herrold's warrantless arrest are subject to suppression from evidence as fruits of an illegal arrest in his home.

An order was entered on July 3, 1991, granting Herrold's motion.