**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William N. LOGAN, Jr. and Eddie Stanley, Defendants–Appellants.**

**No. 90–1827.**

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1991.

J. Dudley Williams, Aberdeen, Miss. (Court-appointed), for Logan.

Ronald Lewis, Oxford, Miss. (Court-appointed), for Stanley.

Thomas Dawson, Asst. U.S. Atty., Charles Spillers, U.S. Atty., Robert Q. Whitwell, Asst. U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before KING, JOHNSON, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants William Logan, Jr. and Eddie Stanley were arrested for participating in a drug distribution ring that sold marijuana and cocaine. That ring, distributing drugs from 1986 through 1989, operated primarily between Texas and Florida. Both Logan and Stanley were convicted of numerous drug-related counts and, together, they appeal their convictions to this court toting a bulky compilation of issues—some applicable to both parties and others not. We have considered their contentions and, con-

cluding that the district court did not commit reversible error, we affirm their convictions.

## I.

### A. The Arrests

On February 11, 1989, police raided the apartment of co-conspirator Frankie Northington located in Lowndes County, Mississippi. The agents seized various drug paraphernalia as well as $2,300.00 in cash, 17 grams of cocaine, a .357 magnum revolver, and a ledger. A page within that ledger contained the following notation:

```
Logan        467.25
           − 100.00
             ───────
             367.25
           − 100.00
             ───────
           [amount scratched out]
             267.00
```

Another page contained Logan's name and three columns of numbers, similar to the one above, with lines drawn through two of the columns. Logan's telephone number was also discovered in an address book in Northington's apartment.

Co-conspirator Corbell, along with Northington and Northington's girlfriend, was present during the raid on Northington's apartment. Following the search, Corbell gave police a written statement. According to that statement, Corbell had sold drugs for Northington in the past; Northington was being supplied drugs by Logan who would deliver one ounce of cocaine usually twice per week; Northington had just given Logan money to buy drugs in Texas; and Logan had gone to Texas and would be returning soon with drugs. Corbell also gave police a description of and directions to a trailer and outbuildings in Monroe County, Mississippi, which Logan was renting from Northington.

On February 12, 1989, Agent Taylor and Sergeant McVey presented Judge Ruble Maxey of the Monroe County Justice Court, First District of Mississippi, with an affidavit for a search warrant for Logan's trailer.[1] The agents also presented sworn

---

1. That same day, the agents saw Stanley and his wife drive up to Logan's trailer. Later, they saw

oral testimony in support of their affidavit. Judge Maxey authorized a search warrant on Logan's residence to search for "[a]ny and all Documentary Evidence, Ledgers, Books, records of drug transactions, to Include Marijuana and Cocaine, Phone Bills, and any and all other Items of Value Linking William Logan to an ongoing Conspiracy to distribute Cocaine and Marijuana, Investigation in Lowndes And Monroe County, MS."

The agents executed the warrant that same day, February 12, and seized triple-beam weighing scales, items containing cocaine residue, and sacks containing marijuana residue. When the agents returned the executed search warrant to Judge Maxey and informed him that they had found drug residue, Judge Maxey issued an arrest warrant charging Logan with possession of cocaine and marijuana. The next day, after reviewing results of the investigation, Judge Phillip Own Robertson of the Lowndes County Justice Court, First District of Mississippi, also issued an arrest warrant for Logan, charging him with conspiracy to distribute controlled substances.

On February 17, Angel Brooks Shaddix gave an oral statement to agents that incriminated herself, Logan, and Northington in a conspiracy to distribute cocaine. She stated that she had gone with Logan to Texas in the past to buy cocaine for resale, and that Logan had recently received money from Northington to buy drugs for him in Texas. She also stated that Logan was currently in Florida delivering drugs to Stanley. While the agents were listening with her consent, Shaddix placed a telephone call to Stanley's residence and learned that Logan had already left and was on his way back to Mississippi.

Following a high-speed chase, Logan was stopped and arrested as he entered Mississippi from Alabama on February 17, 1989. At that time, Logan denied his true identity. After seizing the vehicle for forfeiture because it had been used to transport drugs from Texas and Florida to Mississippi, agents conducted an inventory search of Logan's automobile. The agents seized slightly less than two ounces of cocaine and a loaded .25 caliber semi-automatic pistol from Logan's jacket, which was on the back seat of the automobile.

Stanley was arrested, pursuant to an arrest warrant, in Century, Florida on February 18. Stanley admitted that he knew people from Texas who were distributing drugs to people in Mississippi and other states. He outlined the details of how the cocaine was transported from Texas to Mississippi, as well as details of how marijuana was distributed to various states. Stanley also stated that someone had brought cocaine to his house in Florida, and that he made a telephone call to help this person get rid of the cocaine. At the time of his arrest, Stanley gave agents consent to search and agents seized approximately seventy marijuana plants growing behind his house—just as Shaddix had described.

## B. The Convictions

On August 4, 1989, a grand jury for the Northern District of Mississippi returned a sixteen-count Indictment against nine defendants, including Logan and Stanley. The Indictment charged drug conspiracies between 1986 and 1989 involving cocaine and marijuana, 21 U.S.C.A. § 846 (1981 & Supp.1991); various substantive counts concerning drugs, 21 U.S.C.A. § 841 (1981 & Supp.1991); firearms violations, 18 U.S.C.A. § 924(c) (1976 & Supp.1991); and Travel Act violations, 18 U.S.C.A. § 924(c) (1976 & Supp.1991).

Logan and Stanley were tried jointly, and much of the evidence introduced at trial came from co-conspirators Frankie Northington, Teressa Knight, and Angel Brooks Shaddix. Both were convicted.[2] Logan

---

Stanley's car pulling out of the driveway of the trailer at an excessive speed, and the agents stopped Stanley and arrested him for speeding, operating a vehicle with a suspended driver's license, and possessing beer in open view while in an automobile. Stanley's wife was also arrested for possession of beer, and police officers later discovered marijuana (although less than an ounce) on Mrs. Stanley's person.

**2.** The jury convicted Logan of conspiracy to distribute cocaine, conspiracy to distribute mar-

was sentenced to a total of eleven years; Stanley was sentenced to seven.

## II.

Logan and Stanley have raised a conglomeration of issues, which we have grouped into the following: (a) a challenge to the warrant authorizing the search of Logan's trailer; (b) an alleged violation of Stanley's right to counsel; (c) breaks in the chain of custody of controlled substance exhibits; (d) a challenge to the admission of evidence seized pursuant to Logan's arrest; (e) Stanley's prior state narcotics conviction; (f) challenges by both Stanley and Logan to Travel Act convictions; and (g) an alleged violation of Logan's right to bail.

### A. The Search Warrant on Logan's Trailer

■ On February 12, 1989, a search warrant for the trailer home of Logan was issued and executed. That search uncovered triple-beam weighing scales, items containing cocaine residue, and sacks containing marijuana residue. Logan has challenged the legitimacy of that warrant and the admission of the evidence seized during its execution. According to Logan, agents obtained the warrant with the testimony of a confidential informant, co-conspirator Corbell, without disclosing that informant's background—namely that he was a cocaine user and has a prior felony record.

In reviewing the probable cause determination by the state judge who issued the warrant, the district court considered the affidavit and sworn oral testimony of the

agents, the underlying facts, and then denied Logan's suppression motion. The court upheld the search based on the good-faith exception of *United States v. Leon,* 468 U.S. 897, 923 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677 ("[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."), *reh'g denied,* 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984); *see also United States v. Maggitt,* 778 F.2d 1029, 1033 (5th Cir.1985), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986).[3]

It is undisputed that the agents obtained a search warrant from Judge Maxey and executed that warrant when they searched Logan's trailer. Nevertheless, aware that "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued[,]"[4] we must look to see whether any of those circumstances existed—that is, whether: (i) the warrant fails to particularize the place to be searched and the things to be seized; (ii) the affidavit lacks indicia of probable cause; (iii) the issuing magistrate was not neutral or detached; and whether (iv) the affidavit on which the warrant was based is deliberately or recklessly false. *See Id.* 468 U.S. at 922–24, 104 S.Ct. at 3420–21.

The search warrant in question did particularize the place to be searched and things to be seized.[5] As for Judge Maxey's decision to issue that warrant and the probable cause undergirding it, Agent Taylor

---

ijuana, eight counts of the Travel Act, cocaine distribution, and possession of a firearm. Stanley was convicted of conspiracy to distribute cocaine, conspiracy to distribute marijuana, and four counts of the Travel Act.

**3.** The district court held that:

Under *Leon,* evidence seized is admissible if it is obtained by officers in good faith reliance upon a search warrant issued by a neutral magistrate, even if the affidavit upon which the warrant was based is insufficient to establish probable cause.

\*   \*   \*   \*   \*   \*

Logan does not allege that the magistrate was not neutral and detached or that the warrant failed to particularize the place to be searched or the things to be searched for.

\*   \*   \*   \*   \*   \*

The affidavit cannot be said to be a "bare bones" list of "wholly conclusory statements", nor can it be said to be "devoid of factual support." *See Maggitt,* 778 F.2d at 1036. Therefore, the evidence seized is admissible under the good-faith exception to *Leon.*

*United States v. Logan,* 744 F.Supp. 735, 743–44, 745 (N.D.Miss.1990) ["Opinion"].

**4.** *Id.* 468 U.S. at 922, 104 S.Ct. at 3420.

**5.** More specifically, that warrant contains elaborate directions to Logan's trailer and instructs agent Taylor to seize:

Any and all documentary evidence, ledgers, books, records of drug transactions, to in-

informed Judge Maxey of the search of Northington's apartment in Lowndes County which uncovered drugs, drug paraphernalia, a ledger with pages bearing Logan's name along with monetary figures, and telephone numbers linking Northington and Logan as co-conspirators in the distribution of drugs. The other evidence that Judge Maxey relied upon came from statements made by a confidential informant who had never given any information to law enforcement officials in the past, but who did implicate himself in the conspiracy to distribute drugs.[6] Accordingly, we find that the warrant to search Logan's trailer was not " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]' " [7] and Logan has introduced no persuasive evidence to suggest that Judge Maxey "wholly abandoned his judicial role" when he issued that warrant. *Id.* (citation omitted).

■■■ Our final consideration is whether Judge Maxey "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id., citing Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Despite Logan's allegations that agents *deliberately* withheld information and misled the court to obtain their search warrant, the record does not support Logan's contentions. As noted by the district court and supported by the record:

> Both Agent Taylor and Sgt. McVey testified that they did not tell Judge Maxey that the CI [confidential informant] had given credible information in the past. Agent Taylor stated that if that had been the case, he would have included it in his statement of underlying facts and circumstances. Sgt. McVey testified that he did tell Judge Maxey that the CI was reliable, but he based his

assessment of reliability on the CI (Corbell) incriminating himself, rather than any credible information given in the past. Both agents also testified that they told Judge Maxey that the residence mentioned in the underlying facts where drugs were brought into was a Lowndes County residence and that they told the judge of the raid on the Northington apartment and the documents discovered there that allegedly linked Logan and Northington in a conspiracy to distribute drugs.

Opinion at 739. We, therefore, agree with the district court's determination that the evidence in question satisfies *Leon's* good-faith exception.

### B. The Alleged Violation of Stanley's Right to Counsel

■■■ Once an accused invokes his Fifth Amendment right to counsel, all interrogation must cease. *See Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (holding that, since petitioner made specific request for counsel before interview, police-initiated interview was impermissible); *Miranda v. Arizona,* 384 U.S. 436, 444–48, 86 S.Ct. 1602, 1612–14, 16 L.Ed.2d 694 (1966). Answers to questioning that follows an invocation of one's right to counsel cannot be used to cast doubt upon that original assertion. *See Smith v. Illinois,* 469 U.S. 91, 98–99, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984); *Thompson v. Wainwright,* 601 F.2d 768, 772 (5th Cir.1979); *see also United States v. Porter,* 776 F.2d 370, 370 (1st Cir.1985) (where accused's words and actions are ambiguous, "questioning officers must find out more specifically whether he wants a lawyer before they can proceed further with other questioning"), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *United States v. Cherry,* 733 F.2d

clude marijuana, and cocaine, phone bills, and any and all other items of value linking William Logan to an ongoing conspiracy to distribute cocaine and marijuana; investigation in Lowndes and Monroe County, MS. Defendant's Exhibit DL–2, Hearing on Motions to Suppress, *U.S. v. Logan, Northington & Stan-*

ley, No. CRE89–95–D–D (Hon. Glen H. Davidson—Oxford, Miss. Mar. 30, 1990).

**6.** Opinion at 742–43 (footnote omitted).

**7.** *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421 (citation omitted).

1124, 1130–32 (5th Cir.1984) (inquiries as to desire for consultation with counsel must be limited to clarification and cannot be used to elicit incriminating statements), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). The only exception is when an accused validly waives an earlier request for counsel. *See Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1628. In *Miranda,* the Court emphasized that,

> [i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Id.* at 475, 86 S.Ct. at 1628 (citations omitted). To lift this weighty burden, the government must prove that Stanley's waiver was voluntary and constituted "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981); *see also Tague v. Louisiana,* 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (courts must presume no waiver of constitutional right to counsel).

On February 18, 1989, officers arrived at Stanley's home with a warrant for his arrest. Stanley was warned of his *Miranda* rights—a fact testified to by arresting officer McVey and corroborated by Stanley at trial. Beyond this fact, the testimony of McVey and Stanley differs: Stanley testified that he was denied the opportunity to contact counsel;[8] officer McVey denied that allegation.[9] Stanley did sign a consent to search and gave post-arrest statements.[10]

The district court, after weighing the conflicting testimony, made a credibility determination:

> [Stanley] acknowledged that the agents had given him a proper *Miranda* warning and further he acknowledged that he signed a waiver of his constitutional rights and consented to a search of his premises as reflected by government's exhibit "9" entitled "Consent to Search." The court notes that this form clearly includes the waiver of counsel prior to

---

**8.** Trial Transcript Vol. III at 191–93, *United States v. Logan and Stanley,* No. 90–1827 (5th Cir. filed Apr. 10, 1991) (direct testimony of Eddie Stanley) ["Transcript"].

Q: What was your response [to the *Miranda* warnings]?
A: Told him that I would like my wife to call [attorney] Dudley Williams and my father.
Q: Was your wife there at the house?
A: Yes, sir, she was.

\* \* \* \* \* \*

Q: Okay. Were you able to tell your—was your wife standing there beside you? Were you able to tell her to call Dudley Williams for you?
A: Yes, sir. When they wouldn't let us make any phone calls at that time, my phone rung, and I did answer it, but no phone calls would be made.
Q: They would not allow you to actually have her call an attorney at that point?
A: Told her to stay away from the phone.

\* \* \* \* \* \*

A: As soon as they give me my rights, I was asking them if I was under arrest. He said I was under arrest. I told him I wanted to talk with Mr. Williams.
Q: Did they continue to question you about matters relating to the alleged conspiracy?
A: He told me I wouldn't need a lawyer if I would tell him about where Logan was getting his drugs from and the people involved in Texas.

**9.** *Id.* at 231 (cross-examination of officer McVey):

Q: And you did converse with Mr. Stanley while you were in there in the kitchen or thereabouts?
A: He and his wife, that is correct, but we did not restrict her from phone calls nor him. It didn't matter to us who he called, because we had already arrested everybody. There was nobody to tip off and, had he called an attorney, you know, he would—he could have done so. His wife was there to make a phone call.

**10.** On the day before his oral argument, Stanley directed this court's attention to *United States v. Lilla,* 534 F.Supp. 1247, 1279 (N.D.N.Y.1982). During his oral argument, Stanley emphasized his reliance on this case. *Lilla* holds that "it appears that Michael Lilla specifically exercised his right to counsel by requesting his mother to reach his attorney by telephone." 534 F.Supp. at 1279. However, the *Lilla* facts are distinguishable from those in the case before us. The district court made a credibility determination that we accept: although it is conceivable that Stanley could have asked his wife to telephone his counsel, thereby exercising his constitutional right to counsel, the district court found that he did not.

the search.... Further, it was stipulated that Agent Taylor of the Mississippi Bureau of Narcotics would testify as to all specifics in the same manner as Agent McVey testified before this court. The court is of the opinion that the defendant Stanley made the statements after having been advised of his constitutional rights, including his right to remain silent and to have the assistance of counsel.

Order Requiring Government to Elect Whether to Utilize Statements or to Grant Defendants Separate Trials at 158–60, *United States v. Logan and Stanley,* No. CRE 89–95–D–D (Apr. 13, 1990). A "trial court's factual findings on a motion to suppress must be sustained unless shown to be clearly erroneous." *See United States v. Willis,* 583 F.2d 203, 206 (5th Cir.1978). The district court "observed the witnesses, and [its] credibility assessment warrants due respect." *United States v. Dougall,* 919 F.2d 932, 935 (5th Cir.1990). In the absence of clear error, this court will not challenge that assessment.

### C. Breaks in the Chain of Custody

█ Logan and Stanley both claim that the .25 caliber semi-automatic pistol and the eleven bags of cocaine seized from Logan at the time of his arrest were shuffled along an unreliable chain of custody. The basis for their argument is that, between the time he seized the evidence and the time it was turned over for processing, Officer Grimes drove around for four days with the evidence in the trunk of his car— "four days in which the evidence rode around in Grimes' trunk with other items not recorded by Grimes anywhere but in his head." [11]

We begin by considering whether the chain of custody was shattered irreparably, and we find that it was not. *See* Fed. R.Evid. 901, *interpreted by United States v. Jardina,* 747 F.2d 945, 951 (5th Cir.1984) *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985); [12] *see also United States v. Shaw,* 920 F.2d 1225, 1229–30 (5th Cir.) (despite alleged "glaring gaps" in chain of custody, holding evidence sufficient to conclude that methamphetamine analyzed came from defendant's motel room), *cert. denied,* —— U.S. ——, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991); *United States v. Palella,* 846 F.2d 977, 980–81 (5th Cir.) (evidence sufficient to support trial judge's exercise of discretion in admitting heroin samples), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). Although there was a four-day delay from the time the evidence was seized until it was turned over for proper processing, the evidence was kept locked in the trunk of agent Grimes' car and only Grimes had access to it. [13]

Conscious of this four-day delay, we review the district court's decision to admit the evidence under the abuse of discretion standard, and we look for a prima facie showing of authenticity. *See Shaw,* 920 F.2d at 1229 ("We review a district court's ruling on the admissibility of evidence under the abuse of discretion standard."); *United States v. Casto,* 889 F.2d 562, 568 (5th Cir.1989) ("A trial judge is correct in allowing physical evidence to be presented to the jury as long as a reasonable jury could decide that the evidence is what the offering party claims it to be."), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990); *Palella,* 846 F.2d at 981; *Jardina,* 747 F.2d at 951 ("When confronted with evidence of questionable origin, the court should admit the evidence if a prima facie showing of authenticity is

---

**11.** Brief of Appellant Logan at 36, *United States v. Logan,* No. 90–1827 (5th Cir. filed Mar. 11, 1991) ["Logan Brief"].

**12.** *Id.:*

Fed.R.Evid. 901 governs the authentication of evidence, and its principles apply also to establishing the chain of custody of an exhibit. The Advisory Committee's Note to this rule states that in determining whether to admit evidence of disputed authenticity, the court should use the same procedures set forth in Rule 104(a), which discusses relevancy conditional on fact. The Advisory Committee's Notes to Rule 104(b) require the judge to make a preliminary determination whether a jury could reasonably conclude the disputed condition is fulfilled.

**13.** Neither the government nor the defendants challenge the reliability of the chain of custody from the time Grimes opened his trunk and

made. The sponsor need not present proof beyond a reasonable doubt."); *see also United States v. Cardenas*, 864 F.2d 1528, 1531–33 (10th Cir.), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989). The evidence in question was kept under lock and key and only accessible to Officer Grimes until it was turned over for processing. The processing of the cocaine was scrupulous,[14] and the gun—the only .25 Titan automatic with a scratched-off serial number that Officer Grimes had ever seized—was admitted into evidence only after Officer Grimes identified it by make, model, size, color, style of its grips, and its scratched-off serial number. We find that the government made a prima facie showing of authenticity. *See Palella*, 846 F.2d at 981; *Jardina*, 747 F.2d at 951.

Weaknesses in the chain of custody go to the weight—not the admissibility—of evidence. *See Shaw*, 920 F.2d at 1229–30 ("This court has repeatedly held that any break in the chain of custody of physical evidence does not render the evidence inadmissible but instead goes to the weight that the jury should accord that evidence."); *Casto*, 889 F.2d at 569 ("[A] break in the chain of custody affects only the weight and not the admissibility of the evidence."); *see also Palella*, 846 F.2d at 981. Finding that there was substantial evidence from which the jury could have inferred that the .25 caliber semi-automatic pistol and eleven bags of cocaine are authentic, we hold that the district court did not abuse its discretion in admitting them into evidence.

---

turned the evidence over for processing on February 21, 1989.

**14.** The record supports appellee's contention on this point. *See* Brief of Appellee at 31, *United States v. Logan and Stanley*, No. 90–1827 (5th Cir. filed Apr. 10, 1991) (transcript citations and footnote omitted) ["Appellee Brief"]:

Agent Grimes field tested the substances and they tested positive for cocaine. Agent Grimes turned the 11 packets over to Agent McLeod in the presence of Agent McVey on February 21, 1989. Both agents testified to the procedure whereby the evidence was heat sealed for forwarding to the crime laboratory, which was done in their presence by Agent McLeod. Agent Grimes identified the case number and Agent McLeod's initials on the

## D. Evidence Seized Pursuant to Logan's Arrest

■ Logan was arrested on February 17, 1989 following a high-speed chase. Agents seized slightly less than two ounces of cocaine and a loaded .25 caliber semi-automatic pistol from Logan's jacket, which was on the back seat of his automobile.

Logan claims that the affidavit undergirding his arrest warrant was insufficient, and that the district court therefore erred in admitting evidence seized pursuant to his arrest. Logan overlooks that, even if the warrant for his arrest was invalid, evidence seized incident to that arrest would still be admissible so long as there was probable cause to arrest him. *See United States v. Morris*, 477 F.2d 657 (5th Cir.) (denying motion to suppress) (footnote omitted), *cert. denied*, 414 U.S. 852, 94 S.Ct. 146, 38 L.Ed.2d 101 (1973); *id.* at 663 ("A warrantless arrest is nevertheless valid if the arresting officer has probable cause to believe that the person arrested has committed or is in the act of committing a crime."); *see also United States v. Gaultney*, 581 F.2d 1137, 1146–48 (5th Cir.1978), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 259 (1980) (reversing suppression of evidence where entry of house and subsequent arrest met constitutional requirements of reasonableness).

■ The district court, based on the evidence before it, made findings of fact and found probable cause.[15] Findings of fact

---

heat sealed package. Agent Grimes further testified that the contents of the heat sealed evidence bag were identical in consistency, color and amount with that which he seized from Logan.

It should be noted, however, that, during his oral argument before this court, Logan stressed that an address book from an unrelated case was mixed in with the evidence, suggesting that the evidence is unreliable. Although the discovery of an unrelated address book does suggest that evidence might have been commingled, such a discovery goes to the weight, not the admissibility, of the evidence. *See Shaw*, 920 F.2d at 1229–30.

**15.** The court concluded that:

[P]robable cause existed to arrest Logan for conspiracy to distribute cocaine. Sgt. McVey

at suppression hearings are accorded great deference and will not be disturbed unless they are clearly erroneous. *See United States v. Willis*, 583 F.2d 203, 206 (5th Cir.1978) ("A trial court's factual findings on a motion to suppress must be sustained unless shown to be clearly erroneous."). Because Logan failed to make such a clearly erroneous showing, we will not disturb the court's findings.

## E. *Stanley's Prior State Narcotics Conviction*

When officers arrested Stanley, they seized some 70 marijuana plants growing on his property. Stanley's possession of these plants resulted in his plea of guilty to state possession charges. Both this evidence and Stanley's guilty plea were introduced during trial.

Rule 404(b) of the Federal Rules of Evidence states that evidence of other crimes is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Guidance for applying this rule is provided by the two-part test introduced in *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979): (i) Is the extrinsic offense evidence relevant to one of the Rule 404(b) factors?; and (ii) Is the probative value of that evidence greater than its potential to unfairly prejudice the jury? *See id.* at 911.

Stanley contends that failure on the part of prosecutors to connect his marijuana plants to the drug-running conspiracy, along with the fact that the evidence is, according to Stanley, highly prejudicial, renders that evidence irrelevant and inadmissible.[16] Bound by this court's holding

knew the following: (1) that Logan's name was found beside some figures within a book that Corbell said was a drug ledger; (2) that Logan's phone number was found in Northington's apartment; (3) that Corbell stated that Northington and Logan were selling cocaine and marijuana and that Logan made trips to Texas to buy drugs for Northington to sell; (4) that cocaine and marijuana was [sic] found in Northington's apartment; (5) that marijuana and cocaine residue were found in Logan's trailer; (6) that [co-conspirator] McKnight gave a statement claiming that Logan and Northington were involved in a conspiracy to distribute drugs; (7) that Brooks gave a statement claiming that she had accompanied Logan on trips to Texas to buy cocaine for later resale; (8) that on February 17, 1989, Brooks stated that Logan was in Century, Florida, delivering an ounce of marijuana to Stanley, which was confirmed by a consensually monitored telephone call to Stanley's home in which Brooks was told that Logan had been there but was already on his way back to Mississippi; and (9) that Logan was spotted on the afternoon of February 17, 1989, entering Mississippi from Alabama. The statements of McKnight, Corbell, and Brooks, all co-conspirators with Logan, were all made from personal knowledge and essentially corroborate each other. Those statements combined with the physical evidence seized from Northington's apartment and Logan's trailer were sufficient to establish probable cause. Brooks' [Shaddix's] statement that Logan had gone to Stanley's house in Florida was confirmed by the telephone call. The court is convinced that Sgt. McVey had a reasonable basis to believe that Logan was guilty of being involved in a conspiracy to distribute cocaine. Therefore, there was probable cause for the arrest.
Opinion at 745–46.

16. Stanley also contends that his prior guilty plea on these state narcotics charges and the instant federal narcotics charges violates the double jeopardy clause of the Fifth Amendment. Stanley's argument rests upon an inapposite case, *Grady v. Corbin*—a case involving two successive *state* prosecutions. *See* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

The Supreme Court has stated that dual sovereignty permits a defendant to be punished by both the state and federal sovereigns for the same act. *See Abbate v. United States*, 359 U.S. 187, 195, 79 S.Ct. 666, 671, 3 L.Ed.2d 729 (1959); *United States v. Harrison*, 918 F.2d 469, 474 (5th Cir.1990) ("[T]he Supreme Court has held that, based on the dual sovereignty concept underlying the federal union, an act may be a crime under both federal and state laws and a defendant may be punished by each sovereign for the same act without offending the double jeopardy clause."). This doctrine is, however, limited by the qualification that one sovereign's prosecution may not be used as a disguise for another sovereign's prosecution. *See Bartkus v. Illinois*, 359 U.S. 121, 124, 79 S.Ct. 676, 678, 3 L.Ed.2d 684, *reh'g denied*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). The defendant bears the burden of proof in raising such a double jeopardy claim. *See United States v. Patterson*, 809 F.2d 244, 247 (5th Cir.1987) ("The Supreme Court has held that, based on the dual sovereignty concept underlying the federal union, an act [of a defendant] may be punished by each sovereign for the same act without offending

in *United States v. Kaufman,* we disagree. *See* 858 F.2d 994, 1005 (5th Cir.1988), *reh'g denied,* 874 F.2d 242 (1989). In *Kaufman,* where the defendant challenged admission of his prior conviction for possession of marijuana, the court held that the conviction was admissible to show intent for importing marijuana. *Id.* ("Kissell's earlier conviction for possession of marijuana was certainly similar enough to the charge of importing marijuana in the instant case to shed light on [his] intent."); *see United States v. Haynes,* 881 F.2d 586, 589–90 (8th Cir.1989) (holding that evidence of defendant's prior operation of "weed houses" showed involvement in cocaine conspiracy); *see also United States v. Brookins,* 919 F.2d 281, 285 (5th Cir.1990) (holding that witness testimony about prior drug purchases from defendant "was highly probative of Brookins' guilt, and was not outweighed by any danger of undue prejudice.").

The evidence at issue is 70 marijuana plants growing in Stanley's backyard and the resulting state conviction for possession of that marijuana; the case before us involves participation in a drug-running conspiracy that distributed marijuana and cocaine: we find that, where the underlying crime is drug-running of marijuana and cocaine, evidence suggesting the farming of marijuana is probative of intent, knowledge, and absence of mistake or accident. We also note that the evidence at issue was based upon a conviction,[17] and Stanley's counsel had the opportunity to cross-examine the witnesses and emphasize that the marijuana plants were not connected with Stanley's federal conspiracy count. Accordingly, we hold that the district court did not abuse its discretion in admitting this evidence.

## F. Challenges to Travel Act Convictions

Both defendants challenge their convictions on certain Travel Act Counts, claim-ing that the evidence is insufficient to support their convictions. More specifically, both argue that the only substantive evidence against them was the testimony of Angel Brooks Shaddix, and that her testimony is not enough to convict them.

We have held that "[w]hen reviewing claims that the evidence is insufficient to support a conviction as a matter of law, this Court is obliged to view the evidence, whether direct or circumstantial, and all inferences reasonably drawn from it, in the light most favorable to the verdict." *United ed States v. Molinar–Apodaca,* 889 F.2d 1417, 1423 (5th Cir.1989); *see United States v. Berisha,* 925 F.2d 791, 795–96 (5th Cir.1991); *United States v. Romero–Reyna,* 867 F.2d 834, 835–36 (5th Cir.1989), *cert. denied,* 494 U.S. 1084, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990); *United States v. Nixon,* 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Juries are free to choose among all reasonable constructions of the evidence. *See Berisha,* 925 F.2d at 795; *Molinar–Apodaca,* 889 F.2d at 1423; *United States v. Punch,* 722 F.2d 146, 153 (5th Cir.1983). The ultimate test for sufficiency of evidence challenges is whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt. *See United States v. Gonzales,* 866 F.2d 781, 783 (5th Cir.1989).

The essential elements of the Travel Act, 18 U.S.C.A. § 1952 (1984 & Supp.1991) (emphasis added), are:

(i) *travel* in interstate or foreign commerce, or use of the mail (or any facility) in interstate or foreign commerce;

(ii) with the specific *intent* to promote, manage, establish, or carry on—or dis-

---

the double jeopardy clause."); *United States v. Stricklin,* 591 F.2d 1112, 1117–18 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Stanley has not met this burden and has failed to show that the federal prosecution was merely a sham to permit the federal government to reprosecute him for his state offense.

**17.** The *Beechum* court recognized that the danger of unfair prejudice is great where evidence regards an extrinsic activity that did not result in a conviction. *See* 582 F.2d at 914. Continuing with this reasoning, this court adds that, where evidence is based upon an extrinsic activity, there is a lesser danger of prejudice when that activity *did* result in a conviction.

tribute the proceeds of—unlawful activity; and

(iii) knowing and willful *commission of an act* in furtherance of that intent subsequent to the act of travel.

*See United States v. Hernandez–Palacios,* 838 F.2d 1346, 1350 (5th Cir.1988); *United States v. Carrion,* 809 F.2d 1120, 1127 (5th Cir.1987); *United States v. Cauble,* 706 F.2d 1322, 1351 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).

█ Logan contends that there is no proof of any overt act or other evidence regarding his actions between Florida and Mississippi to establish that he was in-volved in any business enterprise. According to Logan, even when illuminated by light most favorable to a jury conviction, *no* evidence provides *no* basis for such a conviction.[18]

Logan underestimates the evidence. The February 17, 1989 drug-procuring venture at the center of Logan's Travel Act conviction rests within a setting of corroborating testimony that places the incident as one in the daily operation of an ongoing drug distribution enterprise.[19] Teressa Knight,[20] Frankie Northington,[21] and Angel Brooks Shaddix[22]—the trial testimony of these co-conspirators fills hundreds of pages, and the testimony of the agents involved in this case fills hundreds more. Their testimony,

**18.** More specifically, Logan argues that:

The only testimony had at trial regarding a February 1989, [sic] travel act violation was from Angel Brooks Shaddix and her testimony related only to a transaction involving William Logan, Ken Addair and Eddie Stanley as was alleged in Count Fourteen of the indictment.... There being no other evidence presented regarding Logan's actions between Florida and Mississippi to prove a business enterprise or any act in furtherance thereof, and there being no proof of any overt act while looking at the evidence in a light most favorable to a jury conviction for Count Ten, the evidence is wholly insufficient to support said conviction.

Logan Brief at 37–38.

**19.** On February 17, 1989, Shaddix told agents that Logan was currently in Florida delivering drugs to Stanley. While the agents were listening with her consent, Shaddix placed a telephone call to Stanley's residence and learned that Logan had already left and was on his way back to Mississippi. Count Ten of Logan's Indictment reads as follows:

On or about February, [sic] 1989, in the Northern District of Mississippi, WILLIAM N. LOGAN, JR., defendant herein, aided and abetted by EDDIE STANLEY, defendant herein, and other persons known and unknown to the Grand Jury, did travel in interstate commerce between the states of Mississippi and Florida, with the intent to carry on and facilitate the carrying on or [sic] an unlawful activity, to-wit: a business enterprise involving narcotics and controlled substances, as defined in Section 102(6) of the Controlled Substances Act, and thereafter did knowingly perform and attempt to perform said unlawful activity, that is WILLIAM N. LOGAN, JR. did posses [sic] with intent to distribute cocaine, a Schedule II controlled substance, in violation of Section 2 and 1952 of Title 18 of the United States Code.

Superseding Indictment at 7, *United States v. Logan et al.,* Crim. No. CRE89–95 (N.D.Miss. Aug. 4, 1989) (emphasis in original) ["Indictment"].

**20.** Knight, a former girlfriend of Logan, testified that she accompanied Logan from Mississippi to Texas at least 10–15 times for the purpose of picking up drugs, and that, during the last four months of 1988, Logan was making these trips once or twice a week. She also testified that, upon the conclusion of these trips, the drugs were immediately distributed for resale.

**21.** Northington, a drug seller, relied upon Logan to replenish a constantly diminishing marijuana inventory from June/July through November of 1988. According to Northington's testimony, Logan—then traveling to Texas 2–3 times each week to pick up some 5 pounds of marijuana—initially supplied Northington with 2–3 pounds of marijuana per week at a rate of $900 per pound, and then $1,200 per pound. By October/November of 1988, Logan had convinced Northington to switch to cocaine. Logan was then going to Texas 2–3 times per week to pick up cocaine, selling 1–3 ounces to Northington, 1–2 times per week, at $1,000–1,100 per ounce.

**22.** Shaddix testified that, around the time she lived with Logan, she accompanied Logan on a trip to Slidell, Louisiana and several trips to Texas to pick up drugs. Shaddix's testimony was confirmed by that of Karen Wingfield, her former roommate. Wingfield confirmed that she, Shaddix, and Logan travelled to Slidell, Louisiana and that, on the way back, she and Shaddix discovered "a brown paper bag and it had three separate bags of white powder" that Wingfield assumed was cocaine. She also testified that later she stepped into the bedroom shared by Shaddix and Logan and saw "a lot" of marijuana on the floor, resting on a piece of black plastic. Transcript Vol. IV at 735, 739.

woven together by corroborating details, depicts an interstate drug (cocaine and marijuana) distribution ring in operation for perhaps as long as three years.[23] According to this testimony, there was *interstate travel* embarked upon with the *intent* to carry out unlawful drug distribution activity—*activity that was successfully carried out* over a significant period of time. We hold that the jury had sufficient evidence on which to conclude that Logan was guilty of violating the Travel Act. *See Carrion,* 809 F.2d at 1127;[24] *see also Cauble,* 706 F.2d at 1351 (where Travel Act conviction was challenged, applying reasonable jury standard to uphold that conviction).

Like Logan, Stanley challenges his Travel Act conviction under Count Ten of the Indictment, and he adds challenges regarding his Counts Five and Fourteen Travel Act convictions.[25] All of these Counts against Stanley allege that he aided and abetted William Logan's travel between Mississippi, Alabama, and Florida with the intent to facilitate the carrying on of a drug distribution business.

As for his Count Ten conviction, Stanley contends that Shaddix's testimony that Logan visited him in Florida is the only evidence against him. According to Stanley, that is not enough.[26] Stanley challenges his Travel Act conviction under Count

---

23. The record also includes a number of exhibits that confirm this testimony.

24. In light of *Carrion,* this court considers the travel act challenge now before us with a sense of déja vu. The plaintiff in *Carrion* challenged his travel act conviction on the grounds that the evidence was insufficient to show a continuous course of conduct. This court disagreed, holding that:

> In the present case, there was evidence tending to show three deliveries of cocaine.... There was also evidence tending to show that Carrion had distributed cocaine in the past. Further, a reasonable jury could infer from the evidence that there was a drug distribution enterprise headquartered in California and the above transactions ... were part of that enterprise.... We have no difficulty concluding that the evidence sufficiently established a continuous course of conduct.

809 F.2d at 1127 (citation omitted).

25. Count Ten of the Indictment has been quoted *supra* note 19. Count Fourteen reads as follows:

> On or about February 13, 1989, in the Northern District of Mississippi, and elsewhere, WILLIAM N. LOGAN, JR., defendant herein, aided and abetted by KEN ADAIR and EDDIE STANLEY, defendants herein, and other persons known and unknown to the Grand Jury, did travel in interstate commerce between the states of Mississippi and Florida, with the intent to carry on and facilitate the carrying on of an unlawful activity, to-wit: a business enterprise involving narcotics and controlled substances, as defined in Section 102(b) of the Controlled Substances Act, and thereafter did knowingly perform and attempt to perform said unlawful activity, that is, they did possess with intent to distribute and distribute approximately one ounce of cocaine, a Schedule II controlled substance; in violation of Sections 2 and 1952 of Title 18 of the United States Code.

Indictment at 8–9 (emphasis in original). Count Five reads:

> On or about the month of October 1988, in the Northern District of Mississippi and elsewhere, WILLIAM N. LOGAN, JR., defendant herein, aided and abetted by EDDIE STANLEY, defendant herein, and other persons known and unknown to the Grand Jury, did travel in interstate commerce between the states of Mississippi and Alabama, with the intent to carry on and facilitate the carrying on of an unlawful activity, to-wit: a business enterprise involving narcotics and controlled substances, as defined in Section 102(6) of the Controlled Substances Act, and thereafter did knowingly perform and attempt to perform said unlawful activity, that is he did possess with intent to distribute cocaine, a Schedule II, controlled substance, in violation of Sections 2 and 1952 of Title 18 of the United States Code.

*Id.* at 3–4.

26. More specifically, Stanley argues that:

> The only testimony concerning Stanley at trial regarding the offense charged in Count 10 was by Angel Brooks Shaddix. She testified that just prior to William Logan's arrest on February 17, 1989, William Logan had gone to Eddie Stanley's home in Century, Florida. However, she said nothing of any drug transaction on that occasion.
>
> The trial transcript is devoid of any proof of a business enterprise being carried on or any act in furtherance of that enterprise under this particular Count. There is no evidence of (sic) that a telephone call was made.... to show one's guilt as an accomplice, the government must prove that the defendant associated with a criminal venture, participated in the venture, and sought by his actions to make the venture succeed.

Brief of Appellant Eddie Stanley at 34, *United States v. Logan and Stanley,* No. 90–1827 (5th Cir. filed Mar. 11, 1991) ["Stanley Brief"]

Fourteen by arguing that there is no evidence in the record to support notions that he aided Logan's travel to Florida for the purpose of running cocaine. Stanley responds to allegations that he had advance knowledge of illegal interstate travel by Logan on February 13 by pointing out that "it is undisputed that when Logan arrived with the cocaine, Stanley wanted nothing to do with it." [27] His challenge to Count Five is that "the three instances referred to by Teressa Knight in her testimony involve only isolated or sporadic and casual involvement in a 'proscribed activity' and not the kind of business enterprise contemplated by the Travel Act." Stanley Brief at 33.

Again, we turn to the record. Angel Shaddix's testimony regarding the basis for Stanley's Count Ten conviction—Logan's February 17, 1989 drug delivery to Stanley in Florida—is corroborated by the testimony of the agents who were with her (and later took her statement) when she telephoned Stanley at his home in Florida and was told that Logan had just left. More importantly, the trial testimony substantiates the February 13 and February 17 incidents, as well as the Mississippi–Alabama ventures during the month of October 1988, and weaves these journeys securely into the fabric of an ongoing drug-running enterprise: [28]

—Logan met Stanley at least three times in Demopolis, Alabama to receive payment for drugs previously delivered, to deliver drugs, or to take an order for drugs. On other occasions(s), Stanley met Logan in Slidell, Louisiana to receive drugs as Logan was returning from Texas.

—On at least three occasions, Logan traveled to Stanley's house in Florida, and on one of these occasions met drug dealer John Paul Tohill at Stanley's house. This is when Shaddix saw marijuana being grown in Stanley's backyard.

—On February 13, 1989, Logan traveled to Stanley's house in Florida, and Stanley arranged for Logan to distribute an ounce of cocaine to a third party.

—On February 17, 1989, Logan, returning from another trip to Stanley's house in Florida, was arrested entering Mississippi from Alabama in possession of 11 packets of cocaine and a loaded firearm.

Again, our inquiry is limited to determining whether there is sufficient evidence upon which a reasonable jury could conclude Stanley's guilt. After diligently reviewing the record, we find that the evidence is sufficient to convict Stanley on all three Travel Act Counts. *See Carrion,* 809 F.2d

---

**27.** *Id.* at 37–38.

**28.** These findings are compiled from the record, which includes the following testimony:

—Transcript Vol. IV at 359–60 (Northington testimony):

Q: All right. Now, what was the purpose of meeting Eddie Stanley?
A: After we got on the way he said that he needed to go through Demopolis to meet Mr. Stanley, that he had owed him $1100 on some coke that he'd got from him, and he needed to pick that up so he could pay the Tohills [, drug dealers,] some money he owed them.

—*Id.* at 373 (Northington testimony):

Q: All right. Did you see him give Eddie Stanley and ounce of cocaine?
A: Yes, sir.

—Transcript Vol. V at 535 (Knight testimony):

Q: All right. Now, I want to call your attention also in October of 1988 and ask you, did you ever make any trips with Mr. Logan to meet Eddie Stanley?
A: Yes, sir.
Q: And how many trips did you make during that time period?

A: Three.

*    *    *    *    *    *

Q: But what was the purpose of going to Demopolis to meet Eddie Stanley? Why were y'all meeting him?
A: To take him cocaine.
Q: How much cocaine?
A: An ounce.

—*Id.* at 599–600 (Shaddix testimony):

Q: All right. And at that time, what was done with the ounce of cocaine?
A: Logan gave it to Eddie.
Q: And at that time, did Eddie want the ounce of cocaine?
A: No, sir. He told Logan that he didn't need it, and—but he called some guy and he come over there and he took it.

—*Id.* at 602 (Shaddix testimony):

Q: Now, at that time, did you also observe or see any marijuana?
A: Yes, sir.
Q: And where did you see that?
A: It was in Eddie's shed, out behind his house.

at 1127 (finding enough evidence to establish continuous course of conduct for Travel Act purposes); *see also Cauble,* 706 F.2d at 1351 (where Travel Act conviction was challenged, applying reasonable jury standard to uphold that conviction).

### G. *Logan's Right to Bail*

Both Logan and Stanley were denied bail pending · this appeal. Only Logan challenges that decision. Because we affirm Logan's convictions, the question as to whether the district court erred in denying his appeal is now moot. *See United States v. Williams,* 822 F.2d 512, 517 (5th Cir. 1987).

### III.

Accordingly, we AFFIRM.